Joao PIMENTAL

v.

**DEPARTMENT OF TRANSPORTATION for the State of Rhode Island et al.**

Supreme Court of Rhode Island.

July 7, 1989.

Stephen J. Fortunato, Jr., Providence, for plaintiff/respondent.

James E. O'Neil, Atty. Gen., Thomas M. Dickinson, Jeffrey Greer, Asst. Attys. Gen., Providence, for defendant/petitioner.

John A. MacFadyen, Providence, for amicus curiae.

OPINION

FAY, Chief Justice.

This case is before the Supreme Court following our granting of a petition for the issuance of a writ of certiorari to review a judgment of the District Court. That judgment reversed a decision of the Administrative Adjudication Division of the Department of Transportation, holding that drunk-driving roadblocks violate article I, section 6, of the Rhode Island Constitution. We affirm the District Court decision.

The relevant, undisputed facts are as follows. The town of Warren police department established a "sobriety checkpoint" or "drunk-driving roadblock" program in order to screen for intoxicated motorists. The program was initiated following a directive from Captain Robert G. Pare entitled "D.W.I. Roadblock Enforcement." The directive included strict guidelines regarding the planning, operation, procedure, and personnel of the roadblock-enforcement program.

On October 7, 1986, a press release in the Providence Journal indicated that the police department intended to set up weekend roadblocks at several sites in Warren, Rhode Island. The roadblocks, according to the newspaper article, would end a two-month highway-safety program. Although the newspaper column stated that multiple roadblocks would be placed in high-volume-traffic areas, the article did not reveal their precise times or locations.

On October 10, 1986, in the late-evening hours, the police department established a roadblock checkpoint on Metacom Avenue. The roadblock remained in operation into the early morning hours of October 11, 1986. During the period in which the roadblock was in force, police stopped all vehicles passing through the checkpoint area.

The defendant Joao Pimental's vehicle was pulled over at the Metacom Avenue roadblock at approximately 1 a.m. Upon stopping Pimental, the police officer "detected an odor of alcohol [and] noted that defendant's eyes were watery, * * * bloodshot, and that [his] pupils were dilated." Thereafter, the police officer removed Pimental from the roadway, read him his rights, conducted a field sobriety test, and requested that defendant submit to a chemical test. Pimental refused the test and was charged pursuant to G.L.1956 (1982 Reenactment) § 31–27–2.1, as amended by P.L.1986, ch. 508, § 1.[1] The officer then issued defendant a summons under the statute and released him.

The defendant challenged the summons and under § 31–27–2.1 requested a hearing before the Administrative Adjudication Division (AAD) of the Department of Transportation. Prior to the hearing, defendant filed a motion to suppress and exclude all the state's evidence against him because it was obtained in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution and article I, section 6, of the Rhode Island Constitution. The administrative law judge rejected defendant's motion, finding that the roadblock was constitutional.

In reviewing the circumstances surrounding Pimental's arrest, the administrative law judge noted that the roadblock was conducted pursuant to the guidelines incorporated in Captain Pare's directive. The judge also found that the police officers involved in the roadblock had limited discretion in implementing the program. The checkpoint, according to the judge, was accomplished with minimal intrusion to motorists, and the public received adequate prior notice. Therefore, the judge sustained the charge against Pimental and ordered multiple sanctions. The sanctions included a mandatory fine of $203 and a highway-safety assessment of $250. In addition the judge suspended Pimental's license and privilege to operate a motor vehicle for three months, required defendant to participate in the alcohol-education program, and assigned him ten hours of community service.

On April 23, 1987, defendant filed an appeal with the AAD Appellate Panel, reiterating his claim that the roadblock violated the United States and Rhode Island Constitutions. The appellate panel denied Pimental's assertion, and pursuant to G.L. 1956 (1982 Reenactment) § 31–43–4(9), as amended by P.L.1982, ch. 222, § 1, defendant sought review of the panel's finding in District Court.[2] The chief judge of the

1. General Laws 1956 (1982 Reenactment) § 31–27–2.1, as amended by P.L.1986, ch. 508, § 1 reads in pertinent part:

"Refusal to submit to chemical test.—(a) Any person who operates a motor vehicle within this state shall be deemed to have given his consent, to chemical tests of his breath, blood, and/or urine for the purpose of determining the chemical content of his body fluids or breath provided that no more than two (2) complete tests, one for the presence of intoxicating liquor and one for the presence of toluene or any controlled substance as defined in § 21–28–1.02(6) shall be administered at the direction of a law enforcement officer having reasonable grounds to believe such person to have been driving a motor vehicle within this state while under the influence of intoxicating liquor, toluene, or any controlled substance as defined in chapter 28 of title 21 or any combination thereof.

If such person having been placed under arrest refuses upon the request of a law enforcement officer to submit to the tests as provided in § 31–27–2, as amended, none shall be given, but an administrative judge of the division of

administrative adjudication, upon receipt of a report of a law enforcement officer that he had reasonable grounds to believe the arrested person had been driving a motor vehicle within this state under the influence of intoxicating liquor, toluene, or any controlled substance as defined in chapter 28 of title 21, or any combination thereof, that the person had been informed of his rights in accordance with § 31–27–3, that the person had been informed of the penalties incurred as a result of noncompliance with this section, and that the person had refused to submit to the tests upon the request of a law enforcement officer, shall promptly order that the person's operator's license or privilege to operate a motor vehicle in this state be immediately suspended and that the person's license be surrendered within five (5) days of notice of suspension."

2. General Laws 1956 (1982 Reenactment) § 31–43–4(9), as amended by P.L.1982, ch. 222, § 1 provides:

"*Judicial review.* Any person who has exhausted all administrative remedies available to him under the provisions of this section,

District Court reversed the AAD finding in a bench decision, holding that absent statutory authorization, law enforcement officials cannot constitutionally erect roadblocks. Subsequent to the District Court order, the state successfully petitioned for certiorari.

The sole issue to be decided here is whether the Warren police department's drunk-driving roadblock was justified. We have previously noted that Rhode Island citizens hold "a double barrelled source of protection which safeguards their privacy from unauthorized and unwarranted intrusions: the [F]ourth [A]mendment of the Federal Constitution and the Declaration of Rights which is specified in the Rhode Island Constitution." *State v. Sitko*, 460 A.2d 1, 2 (R.I.1983) (quoting *State v. Luther*, 116 R.I. 28, 29, 351 A.2d 594, 594–95 (1976)). Our resolution of the question of whether this drunk-driving roadblock violates the Federal Constitution is controlled by United States Supreme Court precedent. *Oregon v. Hass*, 420 U.S. 714, 719, 95 S.Ct. 1215, 1219, 43 L.Ed.2d 570, 576 (1975).

■ The Supreme Court, however, has recognized the right and power of state courts as final interpreters of state law "to impose higher standards on searches and seizures [under state constitutions] than required by the Federal Constitution." *Cooper v. California*, 386 U.S. 58, 62, 87 S.Ct. 788, 791, 17 L.Ed.2d 730, 734 (1967). This greater protection may be afforded to citizens under a state constitution even if the federal and state language is similar. *Id.* The Federal Constitution only establishes a minimum level of protection. *Oregon v. Hass*, 420 U.S. at 719, 95 S.Ct. at 1219, 43 L.Ed.2d at 576.

We have departed from these minimum standards only when we have determined that our guarantee against unreasonable searches and seizures requires greater protection. Although the Supreme Court had found that a six-person petit jury in a criminal prosecution was adequate under the

Sixth Amendment to the United States Constitution, *Williams v. Florida*, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970), we held that sections 10 and 15 of article I of the Rhode Island Constitution require a twelve-person jury. *In re Advisory Opinion to the Senate*, 108 R.I. 628, 278 A.2d 852 (1971). In *State v. Maloof,* 114 R.I. 380, 333 A.2d 676 (1975), we required stricter compliance with the provisions of our electronic-eavesdropping statute than the Fourth Amendment's requirement of an almost identical federal statute, holding that the search in question was intrusive and unauthorized. Thereafter, in *State v. Benoit*, 417 A.2d 895 (R.I.1980), we invalidated the warrantless search of an automobile four hours after the vehicle had become immobile, despite the fact that the police had seized the automobile lawfully. In finding the seizure unconstitutional, we departed from the Supreme Court's holding that the automobile exception to the warrant requirement included immobilized vehicles. *Id.* at 900–01; *see generally Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct.1975, 26 L.Ed.2d 419 (1970), and *Texas v. White*, 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975). In *State v. von Bulow*, 475 A.2d 995 (R.I.1984), we again suppressed seized evidence under our own constitutional prohibition against unreasonable searches and seizures. In excluding the evidence, we stated that even if the defendant's Fourth Amendment rights had not been violated, our constitution required a finding of an illegal search. *Id.* at 1019.

Although we may grant this greater protection, we note that the Fourth Amendment is an essential guardian of fundamental rights and should, when interpreted, receive great deference by state courts. *State v. Benoit*, 417 A.2d at 899. In most instances the Fourth Amendment provides adequate protection against unreasonable searches and seizures. *Id.* Therefore, our decision to depart from the minimum standards of the United States Constitution and increase the level of protection to Rhode

including an appeal before the appeals board provided herein, and who is aggrieved by the final order of said appeals board, may obtain judicial review in the sixth division of the

district court, in accordance with the provisions of § 42–35–15, and may, in an appropriate case, seek review by the supreme court, in accordance with § 42–35–16."

Island citizens "should be made guardedly and * * * supported by a principled rationale." *Duquette v. Godbout,* 471 A.2d 1359, 1361 (R.I.1984) (quoting *State v. Benoit,* 417 A.2d at 899).

We believe that this case deserves an analysis of whether a principled rationale exists to depart from the standards of protection provided under the Fourth Amendment. Previously, federal law allowed the seizure of a person or automobile only on the basis of probable cause. *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). Federal case law remained relatively unchanged until the landmark case of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *Terry* the Court determined for the first time that a law enforcement official could make a limited seizure of a person without probable cause. The officer, however, was required to have reason to believe that a criminal activity was occurring and that the person involved in such activity was armed and dangerous.

Thereafter, the Supreme Court extended the *Terry* doctrine beyond a search for weapons as long as a trained police officer, relying on articulable facts and rational inferences based upon his experience, formed a reasonable suspicion that a driver of a vehicle might be engaged in illegal conduct. *See United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) (importation of illegal aliens). In implementing the doctrine of reasonable suspicion, the Court invalidated the random stopping of an automobile for the purpose of checking licenses and registrations. *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). This determination was consistent with prior case law and was within the *Terry* doctrine. The Court, however, noted that "[t]his holding does not preclude the State of Delaware or other States from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. Questioning of all oncoming traffic at roadblock-type stops is one possible alternative." 440 U.S. at 663, 99 S.Ct. at 1401, 59 L.Ed.2d at 673–74.

It is at this point that we note that neither this court nor the United States Supreme Court has considered the constitutionality of sobriety checkpoints. We may assume, however, on the basis of language in *Delaware v. Prouse, supra,* that the Fourth Amendment would allow the type of nondiscretionary roadblock stops conducted by the town of Warren. Nevertheless, our analysis does not end here because a principled rationale exists to depart from the minimum standards under the Fourth Amendment.

We shall now make an independent analysis of the safeguards afforded under article I, section 6, of the Rhode Island Constitution. Section 6 is similar to the Fourth Amendment and states:

"The right of the people to be secure in their persons, papers and possessions, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue, but on complaint in writing, upon probable cause, supported by oath or affirmation, and describing as nearly as may be, the place to be searched and the persons or things to be seized."

Additionally, the preamble to article I declares that the maintenance and preservation of the "rights and principles hereinafter mentioned" shall be the "paramount obligation" of the executive, legislative, and judicial branches of the government. *See State v. Maloof,* 114 R.I. at 384, 333 A.2d at 678 (citing preamble to article I of Rhode Island Constitution).

When our Legislature enacted a statutory exclusionary rule, we, like the Supreme Court, permitted the seizure of a person or automobile only on the basis of probable cause. We also followed the rationale of *Terry v. Ohio* not only for Fourth Amendment purposes, as required, but for purposes of interpreting the Rhode Island Constitution as well. *See State v. Halstead,* 414 A.2d 1138 (R.I.1980). Thereafter, in *State v. Benoit,* 417 A.2d at 901, we reiterated that we interpret article I, section 6, to "reflect the intent of the framers [of our constitution] to declare all war-

rantless searches and seizures unreasonable." Only if circumstances render procurement of a warrant impracticable, and society demands swift action, does article I, section 6, allow the "temporary, limited infringement of an individual's right of privacy." 417 A.2d at 901.

■ We believe that allowing such roadblocks or checkpoints would diminish the guarantees against unreasonable searches and seizures contained in the Rhode Island Constitution. It is illogical to permit law enforcement officers to stop fifty or a hundred vehicles on the speculative chance that one or two may be driven by a person who has violated the law in regard to intoxication. We therefore hold that roadblocks or checkpoints, established to apprehend persons violating the law against driving under the influence of intoxicating beverages or drugs, operate without probable cause or reasonable suspicion and violate the Rhode Island Constitution.

In reaching this conclusion, we agree that the state has a compelling interest in detecting drunk drivers. It is well beyond dispute that drunk drivers are a grave menace to the public and that stronger measures are needed to cope with this problem. *See People v. Bartley*, 125 Ill. App.3d 575, 80 Ill.Dec. 894, 466 N.E.2d 346 (1984). We also agree, however, that the state has a significant interest in apprehending and bringing to punishment individuals who commit other serious criminal offenses, such as murder, robbery, burglary, and drug selling, to mention a few.

However, it would shock and offend the framers of the Rhode Island Constitution if we were to hold that the guarantees against unreasonable and warrantless searches and seizures should be subordinated to the interest of efficient law enforcement. Once this barrier is breached in the interest of apprehending drivers who violate sobriety laws, the tide of law enforcement interest could overwhelm the right to privacy. We decline to take the step of approving roadblocks, even for the purpose of apprehending drunk drivers.

The state argued that the roadblock is a deterrent. The effectiveness of such deterrence may be highly questionable, and nothing in the record supports this contention. Even assuming that roadblocks may have some deterrent effect, we believe that it is purchased at too high a price. Doubtless other devices may also increase the effectiveness of law enforcement, including punishment without trial, repealing of the privilege against self-incrimination, dispensing with the right to confrontation of witnesses, and elimination of trial by jury. Such techniques, however, would diminish the rights of all in order to secure the punishment of a few.

Additionally, less intrusive means exist to address the drunk-driving problem. We are confident that trained law enforcement officials can spot violators without having to stop all traffic. Officers observing motor-vehicle operators may then apprehend drunk drivers on the basis of probable cause or at least individualized articulable suspicion.

Courts upholding the constitutionality of roadblocks are aware of their intrusiveness but stress that careful control and absence of discretion can bring the use of the roadblock within the tenets of the Federal and their own State Constitutions. *See, e.g., State v. Golden*, 171 Ga.App. 27, 318 S.E.2d 693 (1984); *People v. Long*, 124 Ill.App.3d 1030, 80 Ill.Dec. 332, 465 N.E.2d 123 (1984); *State v. Garcia*, 481 N.E.2d 148 (Ind.App.1985); *State v. Deskins*, 234 Kan. 529, 673 P.2d 1174 (1983). The relevant factors that have enhanced judicial approval of roadblocks include adequate warnings to minimize fright to the public, advance notice to deter intoxicated individuals from driving, and clearly specified neutral and courteous procedures to reduce the possibility of arbitrary conduct by police officers. *See generally State v. Kirk*, 202 N.J.Super. 28, 493 A.2d 1271 (1985) (discussion of cases upholding drunk-driving roadblocks pursuant to rigorous guidelines).

The Warren police department's drunk-driving roadblock program was accomplished pursuant to strict guidelines with minor intrusion to motor-vehicle operators. In addition motorists were also afforded adequate advance warning of the highway-

safety program. Nevertheless no control or discretion can justify roadblock seizures under Rhode Island law because they are conducted totally in the absence of probable cause or reasonable suspicion that a motor-vehicle violation had occurred. Whereas other states supporting the constitutionality of roadblock programs may find that the drunk-driving problem outweighs the privacy interest of individuals, the Rhode Island Constitution grants greater protection and requires that our citizens be free from unreasonable searches and seizures of this nature.

The founders of this colony, and later this state, valued freedom and liberty above all other interests of society. It is in that tradition of freedom and liberty that we decline to dilute the guarantees of the Rhode Island Constitution. We therefore find that police roadblocks for drunk driving are so violative of our citizens' rights that they must be declared unconstitutional.

Consequently the state's petition for certiorari is denied and the writ heretofore issued is quashed. The judgment of the District Court is affirmed, and the papers of the case are remanded to the District Court with our decision endorsed thereon.

SHEA, Justice, dissenting, joined by KELLEHER, Justice.

As the majority notes, and as this court has said in the past, although the Federal Constitution establishes a minimum level of protection from governmental intrusions for all citizens of the United States, a state is free to interpret its own constitution to afford greater protection to the citizens of that state. *State v. Benoit*, 417 A.2d 895, 899 (R.I.1980) (citing *Oregon v. Hass*, 420 U.S. 714, 719, 95 S.Ct. 1215, 1219, 43 L.Ed.2d 570, 576 (1975)). However, "[t]he decision to depart from minimum standards and to increase the level of protection should be made guardedly and should be supported by a principled rationale." *Id.* at 899.

As acknowledged by the majority, even though the United States Supreme Court has yet to consider the constitutionality of sobriety checkpoints, the Fourth Amendment's minimum level of protection apparently would allow the type of nondiscretionary, minimally intrusive sobriety checkpoint at issue here. *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). In *United States v. Martinez–Fuerte,* 428 U.S. 543, 562, 96 S.Ct. 3074, 3085, 49 L.Ed.2d 1116, 1131 (1976), the Supreme Court approved the use of permanent immigration-checkpoint stops, saying that

"the reasonableness of the procedures followed in making these checkpoint stops makes the resulting intrusion on the interests of motorists minimal. * * * [T]he purpose of the stops is legitimate and in the public interest, and the need for this enforcement technique is demonstrated by the records in the cases before us."

These checkpoint stops were specifically distinguished from the random, roving immigration-patrol stops that were found to violate the Fourth Amendment in *United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), because, although the objective intrusion of a checkpoint—the stops, the questioning, the visual inspection—is nearly identical to that found in random roving-patrol stops, the subjective intrusion—the traveler's concern or fear—is appreciably less. *Martinez–Fuerte,* 428 U.S. at 558, 96 S.Ct. at 3083, 49 L.Ed.2d at 1129. "At traffic checkpoints the motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion." *Id.* (quoting *United States v. Ortiz,* 422 U.S. 891, 894–95, 95 S.Ct. 2585, 2587, 45 L.Ed.2d 623, 628 (1975)).

In 1979, the Court further elaborated on this theme, stating that

"[absent an] articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of

the automobile are unreasonable under the Fourth Amendment. * * * [P]ersons in automobiles on public roadways may not for that reason alone have their travel and privacy interfered with at the unbridled discretion of police officers." *Delaware v. Prouse,* 440 U.S. at 663, 99 S.Ct. at 1401, 59 L.Ed.2d at 673–74.

However, in reaching this conclusion, the Supreme Court specifically stated that

"this holding does not preclude the State of Delaware or other States from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. *Questioning of all oncoming traffic at roadblock-type stops is one possible alternative.*" (Emphasis added.) *Id.*

The central issue in the case before the court is not whether the Warren police department's sobriety checkpoint was justified. According to *Martinez* and *Prouse,* and given Rhode Island's concern for drunk driving, such a roadblock-type sobriety checkpoint could be justified under the Fourth Amendment. Rather, the issue before us is whether, based on art. I, sec. 6, of the Rhode Island Constitution, there is a justifiable and "principled rationale," *Benoit,* 417 A.2d at 899, for this court to depart from the minimum level of protection established by the Fourth Amendment. I do not believe so.

Textually, the Fourth Amendment and art. I, sec. 6, are virtually identical. The purpose of both of these constitutional mandates essentially is "to impose a standard of 'reasonableness' upon the exercise of discretion by government officials, including law enforcement agents, in order 'to safeguard the privacy and security of individuals against arbitrary invasions.'" *Prouse,* 440 U.S. at 653–54, 99 S.Ct. at 1396, 59 L.Ed.2d at 667; *State v. Wilmot,* 461 A.2d 401, 405 n. 5, 408 (R.I.1983) (the

Fourth Amendment's reasonableness standard, balancing public interest against individual rights, is found applicable to art. I, sec. 6, in a decision upholding the constitutionality of a warrantless search of an inmate's cell). In the present case this "reasonableness standard" involves balancing the sobriety checkpoint's promotion of legitimate governmental interests and public policy against its intrusion on an individual's Fourth Amendment rights. *Prouse,* 440 U.S. at 653, 99 S.Ct. at 1396, 59 L.Ed.2d at 667. In cases in which a governmental intrusion lacks the degree of reasonable suspicion or probable cause normally required for a warrantless search and seizure, governmental interests and public policy will be found to outweigh an individual's rights only if they are legitimate public interest concerns and are accompanied by safeguards limiting the discretionary and intrusive nature of the governmental practice. *See id.* at 654–55, 99 S.Ct. at 1396–97, 59 L.Ed.2d at 668.

Several states have approved the use of sobriety checkpoints when they employed the safeguards deemed necessary for the practice to pass constitutional muster.[3] In *Little v. State,* 300 Md. 485, 499–500, 479 A.2d 903, 910 (1984) (quoting *Commonwealth v. McGeoghegan,* 389 Mass. 137, 143, 449 N.E.2d 349, 353 (1983)), the Maryland Supreme Court reasoned:

"For a roadblock to be permissible, it appears that the selection of motor vehicles to be stopped must not be arbitrary, safety must be assured, motorists' inconvenience must be minimized, and assurance must be given that the procedure is being conducted pursuant to a plan devised by law enforcement supervisory personnel. While we do not suggest that advance notice is a constitutional necessity, advance publication of the

---

**3.** *State v. Golden,* 171 Ga.App. 27, 318 S.E.2d 693 (1984); *State v. Deskins,* 234 Kan. 529, 673 P.2d 1174 (1983); *People v. Long,* 124 Ill.App.3d 1030, 80 Ill.Dec. 332, 465 N.E.2d 123 (1984); *State v. Garcia,* 481 N.E.2d 148 (Ind.Ct.App. 1985); *State v. Kirk,* 202 N.J.Super. 28, 493 A.2d 1271 (1985); and *State v. Martin,* 145 Vt. 562, 496 A.2d 442 (1985). According to a recent law-review article, twenty-nine states have ad-

dressed the issue of the constitutionality of sobriety checkpoints. Twenty states have upheld the use of licensing or sobriety checkpoints. Of the nine states holding them unconstitutional, three have subsequently upheld the use of checkpoints relying on the specific regulations at issue. Bruce, *State v. Welch: Drunk Drivers, Roadblocks and the Fourth Amendment,* 57 U.M. K.C.L.Rev. 29, 36–37 & nn. 69–71 (1988).

date of an intended roadblock, even without announcing its precise location, would have the virtue of reducing surprise, fear, and inconvenience."

In a 1988 decision the Massachusetts Supreme Judicial Court reconfirmed the necessity and purpose of comporting with these guidelines:

"Adherence to these guidelines * * * assures that a roadblock seizure is the result of a 'plan embodying explicit, neutral limitations on the conduct of individual officers.' * * * Conducting roadblocks in accordance with such neutral criteria minimizes the risk 'that the individual's reasonable expectation of privacy [will be] "subject to the discretion of the official in the field." ' * * * Adherence to the guidelines' requirements also assures that the surprise, fear, and inconvenience to—and therefore the intrusion on—the motoring public is minimized." *Commonwealth v. Shields,* 402 Mass. 162, 165, 521 N.E.2d 987, 989–90 (1988).

In this case the sobriety checkpoint guidelines are clearly articulated and comport with the constitutional concerns expressed by our sister states and the United States Supreme Court. The guidelines state:

1. The checkpoint site is chosen by administrators and supervisors relying on their awareness of problem areas where accidents and arrests for drunken driving have occurred. In the choice of a site, consideration is also to be given to the safety of and the minimal intrusion to drivers.

2. The date, but not the location, of the intended checkpoint must be announced. In order to educate the public about the purpose of the checkpoint and to deter drunk driving a press release will be published at least two days in advance.

3. Each checkpoint must be planned in advance, and all specifics must be prearranged in order to eliminate any possibility of random or arbitrary implementation.

4. The officers may not arbitrarily select vehicles to be stopped. Either every vehicle or a set number of vehicles, for example, one in every ten passing cars, must be stopped.

5. A supervisor must be present at all checkpoints.

6. In order to ensure safety and to minimize public fear or apprehension of the checkpoint, each checkpoint must have signs, road flares, police cruisers with flashing lights, and a sufficient number of uniformed police officers. Each vehicle may be stopped for one minute or less.

7. The officer must give a "brief and courteous" statement to each driver articulating the purpose of the stop. Only if there is an "articulable sign of possible intoxication will further inquir[y] be warranted."

8. The officer may then pull the car off the road, request a license and registration, and ask the driver to perform certain motor-coordination tests.

These guidelines clearly protect motorists from the discretionary conduct of individual police officers and would cause minimal inconvenience, fear, or surprise. The minimal intrusion on the driver's privacy rights is reasonable and fully within the safeguards provided by art. I, sec. 6, of the Rhode Island Constitution. The majority fails to consider the compelling public interest in deterring drunk driving and safeguarding against the devastating injury and damage caused by so many drunk drivers. I therefore would hold that stopping individuals in sobriety checkpoints without individualized suspicion or probable cause for the purpose of apprehending or deterring drunk drivers is permissible under the language of art. I, sec. 6.

I agree with the majority that there are many areas of criminal conduct that the state has a significant interest in deterring or prosecuting, including murder, burglary, and drug sales. I would note, however, that the majority ponders an issue much broader than the one before us: whether a well-supervised, systematic sobriety checkpoint which safeguards against any discre-

tionary or arbitrary acts by a police officer and protects the driver's privacy rights to the greatest extent possible, violates an individual's rights under the Fourth and Fourteenth Amendments of the United States Constitution or art. I, sec. 6, of the Rhode Island Constitution. I do not foresee the heinous violations to each individual's civil liberties that are dramatized by the majority. Here we consider the narrow application of this checkpoint regulation with the strict standards set forth by the Supreme Court and our sister states. I believe these standards properly balance the interests of the public welfare against the individual's constitutionally mandated right to privacy.

The sobriety checkpoint in question fully comports with the level of protection set forth in the Rhode Island Constitution.