DECISION
This matter comes before this Court on appeal from the District Court for a de novo review pursuant to Rhode Island General Laws Sections 12-22-1 and 12-17-1 from the District Court's finding that the defendant, Marty C. Marran, violated R.I.G.L. § 31-27-2 by operating a motor vehicle while under the influence of liquor and/or drugs. The defendant now moves this Court to suppress the entirety of the state's evidence gathered against him based upon the exclusionary rule under the Forth Amendment of the United States Constitution and/or Article 1 § 6 of the Rhode Island Constitution. In the alternative, the defendant moves this Court to suppress the results of the breathalyzer test administered by the Newport Police, and all evidence of their observations made by them in the Town of Middletown as the product of an unlawful detention of the defendant outside of the jurisdiction of that law enforcement agency. For the reasons set forth herein, the defendant's motion is granted.
FACTS AND TRAVEL OF THE CASE
On August 18, 1994, at 12:26 a.m., Officer John Barker of the Newport Police Department, while on patrol, traveled south on Warner Street in Newport, Rhode Island. At or approximately at the same time, the defendant, Marty C. Marran (Marran) traveled north on Warner Street in Newport, Rhode Island. At the intersection of Warner Street and Newport Avenue, after stopping at a stop sign, Marran took a right hand turn and traveled east on Newport Avenue. A Newport City Ordinance designates the section of Newport Avenue upon which Marran traveled as a one-way street, allowing traffic to drive only in a westerly direction, and thus in the opposite direction than that in which Marran traveled. Officer Barker, having witnessed Marran turn east onto Newport Avenue, turned left and followed Marran down Newport Avenue. Marran then traveled approximately 1/10 of a mile down Newport Avenue until he reached the intersection of Newport Avenue and Broadway. At this time Marran spotted a one-way sign which indicated to him that he was traveling in the wrong direction down Newport Avenue. However, there was no one-way sign posted at the intersection of Warner Avenue and Newport Avenue which would have indicated to Marran that the section of Newport Avenue in question was a one-way street. Although there were two DO NOT ENTER signs posted, they could not be seen by Marran when he pulled onto Newport Avenue from Warner Avenue. Marran, after realizing that he was on a one-way street, took a right hand turn off Newport Avenue and onto Broadway, such that Marran was headed south on Broadway in a permissible direction. Officer Barker then followed Marran down Broadway for about 1/10 of a mile, activated his overhead lights, and pulled Marran over to issue him a citation for traveling the wrong way down the subject section of Newport Avenue.
In the course of the ordinary stop to issue Marran a citation for violating R.I.G.L. § 31-15-9 (b), Officer Barker suspected that Marran was operating his vehicle under the influence of alcohol. At this point, Marran was taken into custody and transported to the Newport Police Station. Marran was read his rights and consented to take a breathalyzer. Officer Lombardi, a certified breathalyzer operator for the Newport Police Department administered a breathalyzer test on Marran at the Newport Police Station at approximately 1:03 a.m. on August 18, 1994. After the machine registered an invalid test, Officer Lombardi waited one minute and administered a second breathalyzer test on Marran. Once again Officer Lombardi was dissatisfied with the results and began to rip the result slip in half. At Marran's request both sets of results were saved and were provided to him in discovery. Officer Lombardi at this point in time suspected that there was a problem with the Newport Police Department's breathalyzer test machine. The Newport Police later became aware that the Newport Police Department's breathalyzer test machine had malfunctioned. After conferring with his superiors, Officer Lombardi informed Marran that he was being transported to the Middletown Police Department to conduct more breathalyzer tests. Marran objected at this point stating that he had already given the breath samples that were required. However, Marran agreed to go to the Middletown Police Department after being informed by the Newport Police that if he did not comply, his noncompliance would be treated as a refusal.
Marran was then transported to the Middletown Police Department and was asked by Officer Lombardi to perform another breathalyzer test. At 1:40 a.m. Marran took his third breathalyzer test. After some delay, at 2:47 a.m., Marran took his forth and final breathalyzer test of the evening. Marran was then transported back to the Newport Police Department where he was charged with violating R.I.G.L. § 31-15-9 (b) for driving down a one-way street in the wrong direction, and with violating R.I.G.L. § 31-27-2 for operating a motor vehicle while intoxicated. Marran then requested and was granted a special arraignment and was released on his own recognizance at approximately 4:30 a.m. on the same day.
The 30 day rule was waived and on November 9, 1994, a trial was conducted in the Second Division District Court. After the trial, Marran was found guilty of driving under the influence of intoxicating liquor in violation of R.I.G.L. § 31-27-2 and the decision was entered with minimum sanctions on November 23, 1994. On November 28, 1994, an appeal was taken to this Court on this matter.
Marran also went to trial on the one-way street infraction in violation of R.I.G.L. § 31-15-9 (b) and was found guilty. A three member panel of the Administrative Adjudication Court affirmed the conviction. The Rhode Island Supreme Court granted Marran's petition for writ of certiorari, and on March 18, 1996 rendered its opinion in Marran v. State of Rhode Island,672 A.2d 875 (R.I. 1996). The Rhode Island Supreme Court held that in the absence of the required one-way street sign at the intersection of Warner Street and Newport Avenue, where Marran made his ill-fated turn, the ordinance which designated Newport Avenue as one-way was ineffective. The Rhode Island Supreme Court stated that under these circumstances Marran could not have violated R.I.G.L. § 31-15-9 (b) as a matter of law. Marran, supra, at 877.
DISCUSSION
The first issue presented to this Court is whether the evidence which has been gathered against the defendant, who was stopped solely on suspicion of having committed that which has been determined to be a lawful act, should be suppressed according to the exclusionary rule under the Fourth Amendment to the United States Constitution and/or Article 1 § 6 of the Rhode Island Constitution. This Court finds that because Marran was stopped for committing what has been determined to be a lawful act by our Supreme Court, the exclusionary rule applies in the instant case and Marran's motion to suppress is hereby granted.
In its memorandum to this Court, the state attempted to distinguish between the original stop of Marran as an investigatory stop and the subsequent arrest based upon Officer Barker's probable cause to believe that Marran was driving while intoxicated. In support of its position, the state relied heavily on State v. Jenkins, 673 A.2d 1094 (R.I. 1996); Terry v. Ohio,392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and State v.Collodo, 661 A.2d 62 (1995). The state, in a supplemental letter to its memorandum submitted State v. Greer, (1996 WL 563868 (Ohio App. 2 Dist.)) as authority in further support of its position that the original stop in this case was valid.
The Rhode Island Supreme Court in State v. Jenkins,673 A.2d 1094 (R.I. 1996) upheld an Administrative Adjudication Court's Appeals Panel decision to deny the defendant's request to suppress all evidence against her which related to the defendant's refusal to take a chemical test in violation of R.I.G.L. § 31-27-2.1. The facts of this case are as follows. The defendant was arrested by the South Kingstown Police Department and was charged with driving under the influence of alcohol in violation of R.I.G.L. § 31-27-2, and refusal to submit to a chemical test in violation of R.I.G.L. §31-27-2.1. After a trial in the District Court, the defendant was found not guilty of having violated R.I.G.L. § 31-27-2. Subsequent to this, in a separate action in the Administrative Adjudication Court, the defendant moved to dismiss all evidence relating to her refusal to take the chemical test under R.I.G.L. § 31-27-2.1. The defendant based her motion upon the District Court's holding that she was not guilty of violating R.I.G.L. § 31-27-2. The defendant contended that because she was found not guilty, the police therefore lacked probable cause to make the original stop. The motion was denied and the defendant was found guilty. The Administrative Adjudication Court's Appeals Panel affirmed this decision affirmed this decision and the defendant appealed to the Rhode Island Supreme Court. In affirming the Administrative Adjudication Court's Appeals Panel, the Supreme Court rejected the defendant's argument that collateral estoppel required all evidence of the defendant's refusal to take the chemical test to be suppressed. The Court stated that the defendant's collateral estoppel argument failed because the District Court's findings and the records thereof did not support the defendant's contention that the District Court found no probable cause to make the stop. Id. at 1096. Furthermore, the Court found that the defendant was charged with violating two different statutes, each with distinct elements. The Court held that in order to establish a violation for a refusal, the state is not required to establish probable cause existed to make the original stop. Id. at 1097. The Courtspecifically found that under the language of R.I.G.L. §31-27-2.1, reasonable suspicion was the proper standard for evaluating the lawfulness of the stop and thus was consistent with the spirit of Terry, supra. Id. The Court therefore found that the police had reasonable suspicion to stop the defendant after the police noticed the defendant's erratic driving, wherein the defendant on two occasions crossed the center line of the highway. Jenkins, at 1097.
In State v. Collodo, 661 A.2d 62 (1995), the Rhode Island Supreme Court upheld the search and seizure of a passenger in a motor vehicle after the Rhode Island State Police made a lawful stop of the vehicle in question. The issue in that case was whether, as is consistent with the rights guaranteed by the United States Constitution and the Rhode Island Constitution, the defendant, who was a passenger in a vehicle lawfully stopped for a traffic violation, could be ordered out of the vehicle and be subjected to a pat-down search of his outer garment? Id. at 63.
In holding that ordering the defendant out of the vehicle, and the subsequent pat-down search, which resulted in the seizure of the defendant's unregistered and loaded handgun by the Rhode Island State Police, the Court stated:
 Because the driver of the vehicle in which the defendant was a passenger exceeded the speed limit by twenty miles per hour, the Rhode Island State Police had a "valid reason" to stop the vehicle . . . that because the vehicle was lawfully stopped, no constitutional rights were violated by asking the defendant to leave the vehicle. Id. at 65.
Finally, as stated previously, the state submitted State v.Greer, 1996 WL 563868 (Ohio App. 2 Dist.) as a supplementary authority to its position. The Ohio Appellate Court held that in a limited class of circumstances, the exclusionary rule may be avoided with respect to evidence obtained as a result of an investigative stop based upon conduct observed by a police officer that the police officer reasonably, but mistakenly believed to be a violation of the law. Id. at * 1.
The defendant in Greer, was stopped after making what was later determined to be a legal U-turn. During the course of the stop, the officer suspected that the defendant was operating his motor vehicle under the influence of alcohol and subsequently arrested the defendant. The trial court suppressed all of the evidence gathered against the defendant. On appeal, the Ohio Appellate Court, relying solely on the federal construction of the exclusionary rule based its reasoning on the good faith exception to the exclusionary rule in United States v. Leon,468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677. The Ohio Appellate Court Stated:
 The exclusionary rule for evidence obtained as a result of unlawful searches and seizures is of purely federal construction. Ohio (unlike Rhode Island) has no independent exclusionary rule for evidence obtained as a result of an unlawful search and seizure. Id. at *3.
The Ohio Appellate Court reasoned that the proper balance of competing interests referred to in Leon, supra, permitted the use of evidence in a small range of cases where evidence has been obtained as a result of an investigative stop based upon a police officer's mistaken but reasonable belief that the conduct which the police officer observed is in violation of the law. Id. at *4. However, in an attempt to limit the scope of this good faith exception to the exclusionary rule, the Ohio Appellate Court stated:
 This exception to the exclusionary rule must be narrowly tailored in order to avoid giving the police the incentive to construe statutes and ordinances broadly for the purpose of finding a violation upon which to predicate an investigative stop. Id.
In its memorandum to this Court, based upon the reasoning in the above cases, the state attempted to validate Officer Barker's stop of Marran on Broadway. The state claimed the stop was valid because Officer Barker had reasonable suspicion to believe that Marran violated a traffic ordinance. The state argued that the interaction between Officer Barker and Marran could only be interpreted as an investigation, even if Officer Barker had already determined that he would issue a citation to Marran for violating a local ordinance. The state further argued that based upon the above-referenced cases, a forward looking test can be gleaned from the reasoning of each which validates the stop in the present case. In effect, the state simply argued that because Officer Barker had grounds to stop Marran, and because this stop was for investigative purposes until Officer Barker had probable cause to arrest Marran for driving while intoxicated, the exclusionary rule should not apply and the defendant's motion to suppress should be denied.
Although this Court finds the state's argument compelling, it cannot accept its conclusion.
In his memorandum to this Court, Marran argued that both the Fourth Amendment to the United States Constitution and Article I § 6 of the Rhode Island Constitution protect Rhode Island citizens against unlawful arrests and warrantless searches by law enforcement officials. Marran further argued that in certain circumstances, the Rhode Island Constitution affords a greater degree of protection than does the United States Constitution. In support of this argument Marran cites State v. Maloof,333 A.2d 676 (R.I. 1975) (greater restrictions on electronic surveillance); Pimental v. Department of Transportation,561 A.2d 1348 (R.I. 1989) (random stop at a drunk driving checkpoint declared unlawful, requiring suppression of evidence).
As pointed out in Davis v. Mississippi, 394 U.S. 721, 726-727, 89 S.Ct. 1394, 1397, 22 L.Ed.2d 676 (1969), the Fourth Amendment of the United States Constitution was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed "arrest" or "investigatory detentions." The Court has rejected the notions that the Fourth Amendment does not come into play at all as a limitation upon police conduct if the officers stop short of something called a "technical arrest or a full-blown search." Thus labeling police conduct as an investigatory stop does not preclude constitutional scrutiny of the police conduct. United States v. Morgan, 743 F.2d 1158
(6th 1984) [Footnote 1].
The preamble to Article I of the Rhode Island Constitution declares that the maintenance and preservation of the "rights and principles herein after mentioned shall be the paramount obligation of the executive, legislative and judicial branches of the government." Pimental v. Department of Transportation,561 A.2d 1348, 1351 (R.I. 1989) (See also State v. Maloof,333 A.2d 676, 678 (R.I. 1975) quoting the preamble to the Rhode Island Constitution). On May 5, 1955, the exclusionary rule became the law of the State of Rhode Island. This law was enacted six years before the exclusionary rule was made mandatory upon the states through the Fourth and Fourteenth Amendments to the United States Constitution; Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed. 2nd 1081 (1961), and reflects our legislature's clear intention to provide independent vitality to Article I § 6 [of the Rhode Island Constitution] in guarding the privacy of the citizens of this state. State v. Von Bulow, 475 A.2d 995 (R.I. 1984).
Rhode Island citizens have a double barreled source of protection which safeguards their privacy from unauthorized and unwarranted intrusions: the Fourth Amendment of the Federal Constitution and the Declaration of Rights which is specified in the Rhode Island Constitution. Pimental, at 1350; (See also Statev. Sitko, 460 A.2d 1, 2 (R.I. 1983), State v. Luther,351 A.2d 594-595 (R.I. 1976)). The Supreme Court . . . has recognized the right and power of state courts as final interpreters of state law to impose higher standards of protection under state constitutions than is required under the United States Constitution. Pimental, at 1350. The United States Supreme Court has taken great pains to point out that in matters of individual liberty, including searches and seizures, the states are free to adopt a higher standard of protection than that compelled by the United States Constitution. Maloof, at 681. In most instances the Fourth Amendment provides adequate protection against unreasonable searches and seizures. Therefore, . . . decisions that depart from the minimum standards of the United States Constitution and increase the level of protection to Rhode Island citizens should be made guardedly and supported by a principled rationale. Pimental, at 1351 (random stop at drunk driving checkpoint declared unlawful, requiring suppression of evidence) [see also Maloof, supra, (greater restrictions on electronic surveillance)].
In support of his argument to this Court, Marran citedCommonwealth v. Censullo, 40 Mass. App. Ct. 65 (1996). InCensullo, the Massachusetts Appellate Court was confronted with virtually the same facts and issue as this Court is presented with in this instant case. In Censullo, a police officer in the Town of Peabody observed the defendant operating a vehicle northbound on Prospect Street. Some five years earlier the local authorities had designated and posted that street as a one-way street, admitting lawful travel only in a southerly direction. However, another local ordinance specifically permitted the residents of nearby Emery Street (of which the defendant was one), to make a left hand turn onto Prospect Street and travel northbound in order to provide them with access to Route 114. The officer, approaching eastbound on Route 114, motioned for the defendant to remain where he was and pulled up his cruiser behind the defendant's vehicle. As a result of the stop, the defendant was arrested for operating a motor vehicle under the influence of intoxicating liquor. The arresting officer testified that he was unaware of the ordinance which permitted residents such as the defendant to operate vehicles in a northerly direction on the subject portion of Prospect Street. A trial was held and the defendant was found guilty of driving under the influence of alcohol. On appeal, the Massachusetts Appellate Court, interpreting federal law under the exclusionary rule, reversed the defendant's conviction by suppressing all of the evidence gathered against the defendant.
Turning to the case at bar, due to the fact that the required one-way sign was missing at the intersection of Warner Street and Newport Avenue, Marran, supra, the defendant's travel on Newport Avenue was lawful; Marran's act was found to be no offense, as a matter of law, because as a matter of fact there were no one-way signs at the intersection of Warner Street and Newport Avenue. Marran's conviction was not reversed because of some legislative or technical defect in the Newport Municipal Ordinance. The state argued for this Court to apply a forward looking test to establish that the stop in question was valid. However, constitutional scrutiny of police conduct, especially under the exclusionary rule, is a backward looking analysis.
Marran argued, and this Court accepts that good faith may well excuse a police officer's mistake of fact as to whether or not a suspect has committed, or was about to commit some act which is a violation of the law. However, there can be no good faith exception to the exclusionary rule where the officer's mistake is one of law. At the very least, this Court declines to extend the good faith exception created in Leon, supra, to the facts of the case at bar.
The Newport Municipal Ordinance in question did not become, as the state argued in its memorandum to this Court, ineffective only in 1996 upon the declaration of the Supreme Court in Marran. The law cited by our Supreme Court in Marran consists of provisions of the R.I.G.L. §§ 31-12-13 and 31-13-5, which were in place at the time of the arrest in the present case. Officer Barker failed to inform himself of the legal requirements of one-way signs at one-way intersections. Officer Barker also failed to note the missing one-way signs at the intersection of Warner Street and Newport Avenue. Finally, Officer Barker failed to inform himself of the R.I.G.L. provisions which expressly invalidated the Newport Municipal Ordinance and which expressly declared the one-way street statute to be unenforceable. Ignorance of the law is no excuse. Where as good faith will not excuse a police officer's ignorance of the law, Officer Barker's good faith ignorance of the law in this case should provide an exception to the exclusionary rule that evidence obtained from Marran's lawful conduct should be admissible. Furthermore, in contrast to Jenkins, supra, there is nothing in Officer Barker's report to indicate that he had any probable cause or reasonable suspicion to believe that Marran was operating his vehicle under the influence of alcohol. In addition, Officer Barker gave no indication anywhere that he had reasonable suspicion to suspect that Marran was committing or was about to commit a crime. Aside from the ineffective and unenforceable one-way street ordinance, there was no independent basis upon which the stop can be justified. Therefore, consistent with the protections afforded citizens under the Fourth Amendment of the United States Constitution, (See Censullo, supra), and consistent with the greater protections afforded citizens of the State of Rhode Island under Article I § 6 of the Rhode Island Constitution, (See Pimental, supra), evidence obtained as a result of a search and seizure made pursuant to an ordinance subsequently declared by the Rhode Island Supreme Court to be invalid, must be suppressed based upon the exclusionary, notwithstanding any possible good faith presumption that at the time of the search and seizure that the ordinance was valid. Extension of the good faith exception to the exclusionary rule in the circumstances of the instant case could create an exception which would subsume the exclusionary rule. The state does have a compelling interest in detecting drunk drivers and strong measures are needed to cope with this problem. Pimental, at 1352. However,
. . . it would shock and offend the framers of the Rhode Island Constitution if [this Court] were to hold that the guarantees against unreasonable and warrantless searches and seizures should be subordinate to the interests of efficient law enforcement. Once this barrier is breached in the interest of apprehending drivers who violate sobriety laws, the tide of law enforcement interest could overwhelm the right to privacy. Id.
 The founders of this colony, and later this state, valued freedom and liberty above all other interests of society. It is in that tradition of freedom and liberty that [the Rhode Island Supreme Court] this Court declines to dilute the guarantees of the Rhode Island Constitution. . . . Id. at 1353.
Therefore, for the reasons stated above, the defendant's motion to suppress is granted.
The second issue presented to this Court, is whether the results of the breathalyzer test administered by the Newport Police, and the evidence of all their observations made by them in the Town of Middletown, should now be suppressed as the product of an unlawful detention of Marran outside of the jurisdiction of that law enforcement agency. This Court finds, because there were reasonable alternative tests available to the Newport Police, no emergency existed, and thus, the results of the breathalyzer test administered by the Newport Police and the evidence of all their observations made by them in the Town of Middletown are hereby suppressed.
The General Laws of Rhode Island limit the authority of a police department to its own jurisdiction. Page v. Staples,13 R.I. 306 (1881). Although, there are exceptions to this general rule; Cioci v. Santos, 207 A.2d 300 (R.I. 1965); State v. Locke,418 A.2d 843 (R.I. 1980), neither the Rhode Island General Assembly, nor the Rhode Island Supreme Court has chosen to extend carte blanche, the authority of a municipal police department outside of its jurisdiction. The general rule from Page has been in existence for over a century and is still good law. It is only in the last twenty-five years that the Rhode Island General Assembly chose to extend a municipal police department's authority outside of its jurisdiction when the police are in "hot pursuit" of a suspect under R.I.G.L. § 12-7-19, or when an emergency situation exists under R.I.G.L. § 45-42-1. Furthermore, it is only in the last sixteen years that the Rhode Island Supreme Court chose to extend a municipal police department's authority outside of its own jurisdiction when a chemical test relating to a suspect's blood alcohol content is in question. If the Rhode Island General Assembly or the Rhode Island Supreme Court felt that municipal boundaries which limit a police department's jurisdiction were not important, either body would have expressly heretofore commented on that issue. There are no exceptions to the Page general rule in the instant case. Therefore, in the absence of statutory authority granted by the Rhode Island General Assembly, or of special emergency circumstances as described by the Rhode Island Supreme Court inLocke, the Newport Police Department's authority ceased to exist over Marran as soon as he was transported outside the city limits of Newport and into Middletown.
The state, in its memorandum of law to this Court relied heavily on Locke, supra, to justify the conduct of the Newport Police in the instant case. In Locke, a Charlestown Police Officer arrested a belligerent suspect for driving while intoxicated. The same suspect had successfully eluded the officer in a 90 m.p.h. chase less than one hour before the arrest. At the time of the arrest, Charlestown had no testing facility or breathalyzer machine, so the officer immediately took the suspect to the Town of Westerly, where a Westerly Police Officer conducted a breathalyzer examination on the suspect. A trial was held thereafter and the defendant was found guilty of driving his vehicle while under the influence of intoxicating liquor.
On appeal, the defendant contended that the Charlestown Police Officer who transported the defendant to Westerly, no longer retained the authority to hold the defendant under arrest, and therefore, because the breathalyzer test was administered when the defendant was unlawfully under arrest, its results were inadmissible as evidence. Id. at 847. The Rhode Island Supreme Court, citing to Cioci, held that the police officer, under the circumstances presented there was justified in carrying the defendant outside of his municipality, and thus conducted the breathalyzer pursuant to a lawful arrest. The Rhode Island Supreme Court stated:
 Public policy requires . . . that police officers who have a citizen in their lawful custody be not deterred from acting to protect the well-being of such person, particularly in circumstance arising out of an emergency . . . . In the instant case, as in Cioci, an emergency existed that impelled the officer to carry the suspect outside of his jurisdiction . . . [the officer] acted to protect the public from a drunken driver and to protect [the defendant] from himself. Under the circumstances, public policy required the officer, in carrying out his duties, to administer a breathalyzer test so that he could intelligently decide whether to remove the defendant from the highway because [of the defendant's] condition . . . . The travel to Westerly was not merely for the convenience of the arresting officer. An emergency did exist; the test had to be given without delay. To allow delay would have in time resulted in the elimination of the traces of alcohol in [the defendant's] blood. For the protection of the public, the police promptly administered the breathalyzer test to decide whether the defendant was a potentially dangerous operator who had to be removed from the highway. Id. at 847-848.
From the holding in Locke, it can be inferred that the Rhode Island Supreme Court allows the police to take defendant's outside of that law enforcement agency's jurisdiction when one of three emergencies exist: 1. To protect the public from a drunken driver, 2. To protect the defendant from himself, and 3. When delay in administering a test under R.I.G.L., § 31-27-2.1
would result in the elimination of traces of alcohol in the defendant's blood. None of these emergency situations existed here.
In the case at bar, Marran allegedly turned and traveled a short distance down a one-way street in the wrong direction. He then turned correctly onto Broadway. The police cruiser came up behind him and the officer activated the overhead lights. Marran immediately pulled over, stopped the motor, and cooperated fully with the officer's directions to him. This is much unlike the situation presented in Locke. The Newport Police had already determined from their field observations that the defendant should not be on the highway. The police removed him, under arrest, to the police station where Marran was in full custody in the Newport Police Department, and thus, posed no danger either to himself or to the general public. There was no "emergency" in the instant case to justify the removal of Marran, under arrest, to another jurisdiction to administer a test under R.I.G.L. §31-27-2.1. In having taken Marran into custody, the ends of protecting both Marran and the public had been accomplished.
Furthermore, there was no "emergency" in the case at bar, as there was in Locke, that traces of alcohol would be eliminated from Marran's blood because reasonable alternative tests were available to the Newport Police Department pursuant to R.I.G.L. § 31-27-2.1. In Locke, unlike here, it appears the Town of Charlestown had no breathalyzer machine at the time. It also appears that the Charlestown Police Department had no facility with a physician readily available to examine the suspect or to take a blood sample, nor any facility for the taking or preserving of a urine sample. In the present case, upon the failure of the Newport Police Department's breathalyzer machine, the Newport Police could have taken and preserved evidence of Marran's blood alcohol content by requesting that Marran provide a urine sample at nearby Newport Hospital. The police also could have taken Marran to Newport Hospital to be examined by a physician for evidence of intoxication, and to provide a blood sample. Marran was never asked to submit to either of these alternative forms of testing, both of which were available within the Newport Police Department's jurisdiction. Marran was transported to the Middletown Police Department at the "convenience" of the Newport Police for one reason only — to obtain another sample of his breath for use subsequently in his prosecution under R.I.G.L. § 31-27-2. Convenience of a law enforcement agency alone does not grant that agency the authority to remove suspects outside of that agency's jurisdiction. Page v. Staples, 13 R.I. 306 (1881).
Finally, the state argued in its memorandum that R.I.G.L. § 31-27-2 clearly states it is within the discretion of the officer as to which tests are to be performed. After a careful reading of R.I.G.L. § 31-27-2, this Court rejects this aspect of the state's argument. Although it is generally within the officer's discretion to choose which test is to be performed, nowhere in R.I.G.L. § 31-27-2 does it state that it is within the officer's complete discretion to decide which test is to be performed. Therefore, when the form of testing ordinarily performed within the officer's usual discretion becomes unavailable, there arises a duty to seek a reasonable testing alternative within the jurisdiction of the arresting authority. The strong public policy of jurisdictional integrity placed an affirmative duty upon the Newport Police Department to exhaust all reasonably available alternative testing options within the city limits of Newport before Marran could be taken to Middletown for additional breathalyzer testing. This Court finds that the Newport Police Department, upon discovering that its breathalyzer machine was not functioning properly, did not exhaust all reasonably available alternative testing options in the present case, for reasons previously stated, before transporting Marran outside of its own jurisdiction.
The blood test and the urine test are, according to R.I.G.L. § 31-27-2 (g), both equally effective and are both equally countenanced by the Rhode Island General Laws and the Department of Health Regulations. Either of those tests could easily and conveniently have been performed within the city limits of Newport at the Newport Hospital.
As it was inappropriate to remove Marran to Middletown and to hold him there, not only did the police have no authority to administer the breathalyzer test there — they had no lawful right to request that Marran take the test. Any "consent" Marran originally gave in Newport was vitiated upon his removal to Middletown.
Therefore, because there were reasonable alternative tests available to the Newport Police, and because no exigent circumstances existed to justify the abrogation of the Newport Police Department's jurisdictional constraints, this Court holds that the results of the breathalyzer test administered by the Newport Police, and all other observations made by them concerning Marran in Middletown are hereby suppressed.