333 A.2d 676.

STATE *vs.* DANIEL L. MALOOF *et al.*

MARCH 13, 1975.

PRESENT: Roberts, C. J., Paolino, Joslin, Kelleher and Doris, JJ.

KELLEHER, J. This is the state's appeal from judgments entered in the Superior Court granting the suppression motions of some 90 defendants most of whom have been indicted on a number of charges involving bookmaking and the illegal sale of lottery slips. Eight of the defendants have been charged with crimes that relate to the sale or possession of drugs. The evidence upon which all the indictments are based was obtained by a series of wiretaps which the state maintains conformed to the pertinent provisions of G. L. 1956 (1969 Reenactment) §12-5.1-1 et seq. We cannot agree with the state's contention.

Chapter 5.1 of title 12, which became effective on May 2, 1969, was adopted in response to Title III of the Omnibus Crime Control and Safe Streets Act enacted by Congress in 1968 and codified as 18 U. S. C. A. §§2510 to 2520 (1970). Our statute, which in most respects is a carbon copy of its federal counterpart, authorizes the Attorney General or an assistant attorney general specially designated by the Attorney General to apply to the Presiding Justice of the Superior Court for an order authorizing the electronic interception of "any wire or oral communications" by certain federal, state, or municipal law enforcement officers as they conduct an investigation of several specified crimes including conspiracy, murder, and robbery, as well as certain gambling or drug offenses that are punishable by imprisonment for a period of more than a year.

On March 2, 1972, the then Attorney General submitted an application to the then Presiding Justice of the Superior Court for an order whch would have allowed the state police to tap a telephone having the unlisted number of 849-4123.

In his sworn application the Attorney General indicated that the telephone which was registered in the name of a Dale M. Roche was located in a two-story wooden dwelling situated in Newport at 2 J. T. Connell Highway. The Attorney General asserted that information presented to him by members of the state police both past and present led him to believe that defendant Maloof was using 849-4123 to promote bookmaking and the sale of policy slips as well as to conspire with different individuals at different times to further these illicit activities.

Attached to the application were a number of affidavits of members of the Intelligence Unit of the state police indicating the results of their surveillance of Maloof as he traveled in and around Newport during the months of January and February 1972.

The authorization order permitting the installation of a tap on 849-4123 was signed by the Presiding Justice on March 2, 1972. It contained a finding that there was probable cause to believe that Maloof was violating the state gambling laws and that he was using 849-4123 to commit these offenses. The order permitted the police to tap the telephone every day for a 30-day period between the hours of 9 a.m. and 7 p.m.

As the result of the conversations that were intercepted on the Maloof tap, the Attorney General applied to succeeding Presiding Justices for six additional authorizations. All applications were granted. The first extended the Maloof tap an additional 15 days. The remaining five, which were issued at different times during April, May, July, and September of that year authorized the telephone taps on residences located in Providence, Cranston, and Johnston. Each order called for a 30-day tap. The state concedes that the information that caused the issuance of six additional orders came from the initial Maloof intercept.

Section 12-5.1-5 relates to the form and content of the

authorization order.[1]  Section 12-5.1-5(b) in its relevant portions specifically states that

> "No order entered under this section may authorize the interception of any wire or oral communication for any period longer than is necessary to achieve the objective of the authorization, nor in any event longer than thirty (30) days. * * * Every order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter, and must terminate upon attainment of the authorized objective, or in any event in thirty (30) days."

The March 2, 1972 order complied with the statute in all respects but one. It expressly provided that the interception "* * * *need not terminate upon attainment of the authorized objective,* and, in any event, shall terminate within thirty (30) days." (emphasis added)  The extension order and the subsequent orders signed by various Presiding Justices contained no command that the tap cease once the order's objective had been attained.

The state, in seeking to alleviate the errors of commission or omission that are present in the seven authorization orders, argues that the orders in question are in substantial compliance with the statute and that "* * * the ends of justice will not be best served by confining the authorizing judge within a set of categorical imperatives."  While we admire the state's rhetoric, we cannot subscribe to its reasoning.

Wiretapping or electronic eavesdropping may be a valuable tool in a police officer's arsenal as he wages war with the criminal element in our society.  However, the use of

---

[1] In the appendix attached to this opinion we have set forth in full the statutory requirements of the application which is to be submitted by the Attorney General or his designee and the order which is to be signed by the Presiding Justice.

such devices[2] poses a threat to a constitutional right that is not only guaranteed by the fourth amendment of the United States Constitution but is also embodied within the Declaration of Rights of the Rhode Island constitution. Article I, §6. Both documents expressly provide that the right of the people to be secure in their persons, papers and possessions against unreasonable searches and seizures shall not be violated. The preamble to our art. I declares that the maintenance and preservation of the "rights and principles hereinafter mentioned" shall be the "paramount obligation" of the executive, legislative, and judicial branches of our government.

Today, we live in an age of electronic magic in which the "unwelcome ear" or the "invisible invader" seems to be everywhere. There are times when some of us wonder whether the Orwellian age is not already at hand. In replying to the exhortations made by the state, we shall briefly review the significant judicial and legislative pronouncements made in this most controversial area.

The use of a telephone tap was upheld in *Olmstead* v. *United States*, 277 U. S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928). There, in speaking for the majority, Mr. Chief Justice Taft stated that the search and seizure language of the fourth amendment applied only to tangible objects of a governmental search and seizure which was accompanied by a trespassory incursion upon another's property. In dissenting, Mr. Justice Holmes described governmental wiretapping as "dirty business." Mr. Justice Brandeis observed in his dissent that a wiretap invades the privacy of the person at both ends of the line and that it allows the overhearing of all types of conversations. This distinguished

---

[2]Today such devices are usually referred to as the "bug" and the "tap." The "bug" is a concealed microphone which overhears private conversations in a particular place. The "tap" is the interception of a telephone conversation.

jurist, in predicting the technological advances that we have witnessed, *i.e.,* the miniaturization of radio transmitting equipment, described writs of assistance and general warrants as "puny instruments of tyranny and oppression when compared with wire-tapping."

Following *Olmstead,* the Supreme Court reiterated its no trespass doctrine in upholding the use of a wiretap or eavesdropping device which when placed against a wall permitted the eavesdropper to hear the conversations taking place in the adjoining room. *Goldman* v. *United States,* 316 U. S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942). Here in Rhode Island, at its January 1949 session, the General Assembly, apparently concerned about the threat to an individual's privacy posed by such surreptitious intrusions, made wiretapping a crime and barred the state's use in the courts of any evidence obtained through such a tap. The only permitted taps were those performed by employees of a corporation subject to the jurisdiction of either the Federal Communications Commission or the Public Utility Administrator. Public Laws 1949, ch. 2325, §1; G. L. 1956 §§11-35-12, 13 (repealed 1969).

In the early 1960's the Supreme Court still adhered to the trespass doctrine of *Olmstead.* In *Silverman* v. *United States,* 365 U. S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961), a spike mike was forced through a wall until it struck a heating duct in the defendant's room. The Court, in overturning the conviction, found the contact between the microphone and the duct to be a technical trespass which satisfied *Olmstead's* requirement of a physical intrusion. Finally, in 1967, the Court overruled *Olmstead* and declared that the fourth amendment was designed to protect "people" and not simply "areas" and that the reach of the amendment was not to be dependent upon the presence or absence of a physical intrusion. *Katz* v. *United States,* 389 U. S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

While in *Silverman* the Court implicitly recognized that the spoken word fell within the ambit of protection afforded by the fourth amendment, it was not until *Wong Sun* v. *United States,* 371 U. S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), did the Court explicitly state that oral evidence as well as physical evidence could be the subject of a search and seizure which, in turn, had to satisfy the requirements of the fourth amendment.

*Katz* was one of a trio of cases involving eavesdropping that were heard and decided by the United States Supreme Court during its October 1966 and October 1967 terms. The remaining two were *Osborn* v. *United States,* 385 U. S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966), and *Berger* v. *New York,* 388 U. S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967).

The Court in *Berger* faulted the New York wiretapping statute because it (1) did not satisfy the fourth amendment's mandate that requires particularization of "the place to be searched and the persons or things to be seized"; (2) permitted a series of searches and seizures upon a single showing of probable cause; (3) placed no termination date on the eavesdrop once the conversation sought was seized; and (4) failed to provide for a notice of entry to the accused and a report to the magistrate of the items seized.

*Osborn* ruled that a federal court, under "precise and discriminate circumstances," could empower federal agents to use a concealed recorder to verify the allegations of a detailed factual affidavit that charged the commission of a specific criminal offense.

Title III and ch. 5.1 are Congress' and the General Assembly's responses to the holdings and observations made in *Berger, Katz,* and *Osborn.* Both enactments are replete with precise directions as to what is to be set forth in the Attorney General's application and the order which follows. Both Congress and the General Assembly require the suppression of evidence that has been "unlawfully intercepted"

or is the result of an authorization order that is "insufficient on its face" or is the product of an interception that does not conform to the authorization order.

Last spring the Supreme Court held that the phrase "unlawfully intercepted" was not limited to instances where the subject's constitutional rights have been violated but included within its ambit any failure "* * * to satisfy * * * those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *United States* v. *Giordano,* 416 U. S. 505, 527, 94 S.Ct. 1820, 1832, 40 L.Ed.2d 341, 360 (1974). The application in *Giordano* had been authorized by the executive assistant to the Attorney General. The Supreme Court affirmed the grant of the defendant's motion to suppress on the ground that Congress never intended that the power to authorize wiretap applications be exercised by anyone other than the Attorney General or his specially designated assistant.

In a companion case the Court ruled that in view of the fact that an application had actually been approved by the Attorney General, the misidentification in the application of the officer allegedly authorizing its submission did not render the subsequent order "unlawful." *United States* v. *Chavez,* 416 U. S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974).

The issue presently before us had nothing to do with the application submitted by the Attorney General, but rather it concerns the validity of all the authorization orders presented to the several Presiding Justices for their signatures. The state has asked that we adopt the reasoning set forth in *United States* v. *Cafero,* 473 F.2d 489 (3d Cir. 1973), where the Court said that there was no necessity to include within an order a directive calling for a termination of the interception upon its reaching its authorized goal, because all orders contain this mandate as a matter of law irrespective

of whether the specific language was included within the order. While we give great deference and respect to the views expressed by the Court in *Cafero,* we cannot subscribe to their view as to the thrust of the language in question.

To begin with we are not dealing with an order that is completely silent as to when the tap shall be disconnected. The first order flies in the face of the express language[3] of the statute in that it clearly states that the intercept need not terminate upon the accomplishment of the order's purpose. This order is truly "insufficient on its face" and consequently the evidence it produced should be suppressed. Since the evidence obtained by the remaining orders is unquestionably tainted in that it is the fruit of the poisonous tree, it, too, should be suppressed.

The exclusion of all the evidence gathered by the state can also be justified on another and, we believe, more significant ground. We make this statement with the knowledge that within recent times we have as a matter of law incorporated within a public works contract a statutory stipulation that demands the inclusion within such agreements of a clause calling for the arbitration of disputes when the contract in question contained no such provision. *Sterling Eng'r & Constr. Co.* v. *Housing Authority,* 108 R. I. 723, 279 A.2d 445 (1971). The root issue in this appeal is not a contract but a constitutional right which seeks to

---

[3]Earlier in 1974 the Supreme Court ruled that the government is not required to conduct a thorough investigation to learn the identity of any person who is likely to use a telephone for illegal purposes before it may seek an authorization order. A tap of a phone being used by a person whose identity is described "as yet unknown" may be authorized, even though the police actually know the individual, if the police have no probable cause to believe the individual is involved in the improper use of the communication equipment. *United States* v. *Kahn,* 415 U. S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974). The Court observed that the statute's plain language requires identification of the person "known" to be "committing the offense." We think that the language in issue before us is just as plain as that considered by the Supreme Court in *Kahn.*

safeguard one's privacy from unwarranted and unauthorized intrusions. It is a right that protects conversations as well as property and it might be described as a double-barreled right in that it is set forth in the United States Constitution and the Rhode Island constitution. As part of our Declaration of Rights, it enjoys a status which is separate and apart from the status it has been given by the fourth amendment.

The United States Supreme Court has taken great pains to point out that in matters of individual liberty, including the area of search and seizure, the states are free to adopt a higher standard of protection than that compelled by the Federal Constitution. *Alderman* v. *United States,* 394 U. S. 165, 175, 89 S.Ct. 961, 967-68, 22 L.Ed.2d 176, 188 (1969); *Cooper* v. *California,* 386 U. S. 58, 62, 87 S.Ct. 788, 791, 17 L.Ed.2d 730, 734 (1967); *Johnson* v. *New Jersey,* 384 U. S. 719, 733, 86 S.Ct. 1772, 1781, 16 L.Ed.2d 882, 892 (1966).

In dealing with the orders bearing the signatures of the Presiding Justices we must be realistic and recognize that the execution of such an order is a function performed by police officers who, while they may be ever dedicated to the conscientious discharge of their duties, are not conversant with the many explicit conditions and circumstances that are detailed in §12-5.1-5. The orders given the police speak of a 30-day intercept and omit the statute's command to stop the tap if within those 30 days the purposes of the order have been realized. This court has said that we do not expect a police officer in the execution of a search warrant to act with the precision of a surgeon as he wields a scalpel,[4] neither can we expect that the police be conversant with the many precise commands delineated in the wiretap

---

[4]*State* v. *Johnson,* 102 R. I. 344, 230 A.2d 831 (1967). We have also recognized that the telephone plays an important role in any successful bookmaking operation. *State* v. *Nerney,* 110 R. I. 364, 292 A.2d 882 (1972).

act. That is the primary responsibility of the professionals who draw up the application and the order, the Attorney General's Department.[5] In the interest of giving the full measure of protection to an individual's privacy, particularly as it relates to electronic eavesdropping, we shall insist upon a closer adherence to the Rhode Island statute than may be expected by those who interpret the federal legislation. In so doing, we give added meaning to the state's constitutional guarantee of privacy,[6] a position that is shared by several jurisdictions that have considered their respective electronic surveillance statutes. *In re Olander,* 213 Kan. 282, 515 P.2d 1211 (1973); *State v. Siegel,* 266 Md. 256, 292 A.2d 86 (1972); *cf. State v. Frink,* 296 Minn. 57, 206 N.W.2d 664 (1973).

Having in mind our paramount obligation to ensure that one's conversation remains within the confines of his home or office, we feel that the people are entitled to expect that any authorized intrusion on their conversations will be of the shortest possible duration. The orders to which we have

---

[5] In a paper prepared as background material for the participants at the Annual Chief Justice Earl Warren Conference, Professor Herman Schwartz has chronicled what has transpired since law enforcement bugging and tapping received the legislative imprimaturs of the federal and state legislative departments in the late mid-1960's. The conference which was sponsored by The Roscoe Pound-American Trial Lawyers Foundation was held on June 7-8, 1974. The professorial effort is entitled *Reflections On Six Years of Legitimated Electronic Surveillance* and can be found in the conference's final report, *Privacy in a Free Society* at 38-55. One reflection worthy of repeating, especially in the light of the orders presently under review, is an alleged tendency of judges to rely on the prosecutors' representations thereby rendering the procurement of an authorization order a matter of routine. Similar comments can be found elsewhere. Spritzer, *Electronic Surveillance By Laws of the Magistrate: The Case in Opposition,* 118 U. Pa. L. Rev. 169, 201 (1969).

[6] The potential broad sweep of an electronic search is manifested by the fact that eight of the defendants are accused of narcotic offenses. The incriminating evidence was obtained by taps that were seeking information concerning bookmaking and the sale of lottery policy slips.

referred do not live up to this expectation. The motions to suppress were properly granted.

The state's appeal is denied and dismissed.

## APPENDIX

12-5.1-2. Application for orders.—(a) The attorney general, or an assistant attorney general specially designated by the attorney general, may apply ex parte to the presiding justice of the superior court of competent jurisdiction for an order authorizing the interception of any wire or oral communications. Each application ex parte for such order must be in writing, subscribed and sworn to by the applicant.

(b) The application must contain:

(1) The identity of the officer making the application;

(2) A full and complete statement of the facts and circumstances relied upon by the applicant to justify his belief that an order should be issued, including: (i) details as to the particular designated offense that has been, is being, or is about to be committed, (ii) a particular description of the nature and location of the facilities from which, or the place where the communication is to be intercepted, (iii) a particular description of the type of communications sought to be intercepted, and (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted;

(3) A full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous;

(4) A statement of the period of time for which the interception is required to be maintained. If the nature of the investigation is such that the authorization of interception should not automatically terminate when the described type of communication has been first obtained, a particular description of facts establishing probable cause to believe that additional communications of the same type will occur thereafter;

(5) A full and complete statement of the facts concerning

all previous applications, known to the individual making the application, made to the presiding justice of the superior court for authorization to intercept wire or oral communications involving any of the same persons, facilities or places specified in the application, and the action taken by the presiding justice of the superior court on each such application; and

(6) Where the application is for the extension of an order, a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results.

(c) The presiding justice of the superior court may require the applicant to furnish additional testimony or documentary evidence in support of the application.

(d) Allegations of fact in the application may be based either upon the personal knowledge of the applicant or upon information and belief. If the applicant personally knows the fact alleged, it must be so stated. If the facts establishing such reasonable cause are derived in whole or in part from the statements of persons other than the applicant, the sources of such information and belief must be either disclosed or described, and the application must contain facts establishing the existence and reliablity of the informant, or the reliability of the information supplied by him. The application must also state, so far as possible, the basis of the informant's knowledge or belief. If the applicant's information and belief is derived from tangible evidence or recorded oral evidence, a copy of detailed description thereof should be annexed to or included in the application. Affidavits of persons other than the applicant must be submitted in conjunction with the application if they tend to support any fact or conclusion alleged therein. Such accompanying affidavits may be based either on personal knowledge of the affiant, or information and belief with the source thereof and reason therefor specified.

12-5.1-5. Form and content of orders.—

(a) Each order authorizing the interception of any wire or oral communication shall specify—

(1) the identity, or a particular description of the person, if known, whose communications are to be intercepted;

(2) the nature and location of the communications facilities as to which, or the place where, authority to intercept is granted;

(3) a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates;

(4) the identity of the agency authorized to intercept the communications; and

(5) the period of time during which such interception is authorized, including a statement as to whether or not the interception shall automatically terminate when the described communication has been first obtained.

(b) No order entered under this section may authorize the interception of any wire or oral communication for any period longer than is necessary to achieve the objective of the authorization, nor in any event longer than thirty (30) days. Extensions of an order may be granted, but only upon application for an extension made in accordance with §12-5.1-2 and the court making the findings required by §12-5.1-4. The period of extension shall be no longer than the presiding justice of the superior court deems necessary to achieve the purposes for which it was granted and in no event for longer than thirty (30) days. Every order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter, and must terminate upon attainment of the authorized objective, or in any event in thirty (30) days.

(c) Whenever an order authorizing interception is entered pursuant to this chapter, the order may require

reports to be made to the presiding justice of the superior court who issued the order showing what progress has been made toward achievement of the authorized objective and the need for continued interception. Such reports shall be made at such intervals as the presiding justice of the superior court may require.

*Richard J. Israel*, Attorney General, *Donald P. Ryan*, Asst. Attorney General, for plaintiff.

*John Tramonti, Jr., Leo Patrick McGowan, Leonard A. Kiernan, Jr., J. Joseph Nugent, Dennis S. Baluch, Joseph A. Capineri, Paul F. Murray, Joseph J. Nicholson, Matthew Faerber, Moore, Virgadamo, Boyle & Lynch, Ltd., Francis J. Boyle, Jeremiah C. Lynch, Jr., Laurent L. Rousseau, Joseph R. Palumbo, Jr., Corcoran, Peckham & Hayes, Joseph T. Houlihan, Kathleen Managhan*, for defendants.