May 5, 2022

**Supreme Court**

No. 2019-324-C.A. (P1/18-3099AG)
No. 2019-326-C.A. (P1/18-3099AAG)
No. 2019-328-C.A. (P1/18-3099BBG)
No. 2019-329-C.A. (P1/18-3099BG)
No. 2019-330-C.A. (P1/18-3099CG)
No. 2019-333-C.A. (P1/18-3099DDG)
No. 2019-334-C.A. (P1/18-3099EEG)
No. 2019-335-C.A. (P1/18-3099EG)
No. 2019-336-C.A. (P1/18-3099FG)
No. 2019-344-C.A. (P1/18-3099GG)
No. 2019-345-C.A. (P1/18-3099HG)
No. 2019-346-C.A. (P1/18-3099JG)
No. 2019-349-C.A. (P1/18-3099PG)
No. 2019-352-C.A. (P1/18-3099QG)
No. 2019-354-C.A. (P1/18-3099SG)
No. 2019-355-C.A. (P1/18-3099VG)
No. 2019-358-C.A. (P1/18-3099WG)
No. 2019-361-C.A. (P1/18-3099YG)
No. 2019-363-C.A. (P1/18-3099OOG)

State                          :

v.                             :

Deric S. McGuire et al.        :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email:   opinionanalyst@courts.ri.gov,   of   any typographical or other formal errors in order that corrections may be made before the opinion is published.

**Supreme Court**

No. 2019-324-C.A. (P1/18-3099AG)
No. 2019-326-C.A. (P1/18-3099AAG)
No. 2019-328-C.A. (P1/18-3099BBG)
No. 2019-329-C.A. (P1/18-3099BG)
No. 2019-330-C.A. (P1/18-3099CG)
No. 2019-333-C.A. (P1/18-3099DDG)
No. 2019-334-C.A. (P1/18-3099EEG)
No. 2019-335-C.A. (P1/18-3099EG)
No. 2019-336-C.A. (P1/18-3099FG)
No. 2019-344-C.A. (P1/18-3099GG)
No. 2019-345-C.A. (P1/18-3099HG)
No. 2019-346-C.A. (P1/18-3099JG)
No. 2019-349-C.A. (P1/18-3099PG)
No. 2019-352-C.A. (P1/18-3099QG)
No. 2019-354-C.A. (P1/18-3099SG)
No. 2019-355-C.A. (P1/18-3099VG)
No. 2019-358-C.A. (P1/18-3099WG)
No. 2019-361-C.A. (P1/18-3099YG)
No. 2019-363-C.A. (P1/18-3099OOG)

State                              :

        v.                         :

Deric S. McGuire et al.            :

Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

- 1 -

# O P I N I O N

**Justice Goldberg, for the Court.** These consolidated cases came before the Supreme Court on February 23, 2022, on appeal by the State of Rhode Island, seeking review of a Superior Court order granting the defendants'[1] motion to suppress all wire, electronic, or oral communications obtained through the use of wiretaps and any subsequently obtained evidence.[2] The state argues that the trial justice erred in finding that an associate justice of the Superior Court had no authority to issue the wiretap orders and that, even if the associate justice was without statutory authority, the trial justice erred in concluding that suppression of the evidence derived from those wiretap orders was warranted. For the reasons stated in this opinion, we affirm the order of the Superior Court.

---

[1] The indictment in these consolidated cases includes forty-one named defendants, twenty-four of whom joined the motion to suppress filed by the defendant, Deric S. McGuire (McGuire), before the Superior Court. On May 29, 2020, this Court consolidated twenty-one appeals, which included a later-dismissed cross-appeal. On April 24, 2020, the appeal in No. 2019-331-C.A. (P1/18-3099CCG) was withdrawn. Therefore, nineteen of the defendants that were joined in the motion to suppress before the Superior Court are currently parties to these consolidated appeals.

[2] McGuire filed a cross-appeal, No. 2019-325-C.A., which was denied and dismissed pursuant to an order of this Court on March 23, 2021, as an interlocutory appeal. We note that McGuire's cross-appeal pertained to whether the Assistant Attorney General was authorized to apply for the wiretap orders at issue, because there was no notification of her special designation to the Secretary of State. This issue remains outstanding.

## Facts and Travel

These consolidated cases arose from a Rhode Island State Police investigation into alleged outlaw motorcycle gangs, which led to an indictment in November 2018 against forty-one defendants charging 424 criminal counts, including possession of and possession with intent to deliver controlled substances, conspiracy, and unlawful possession of firearms. As part of the investigation, from May 2017 through May 2018, an Assistant Attorney General presented applications for several orders authorizing the interception of wire, electronic, and oral communications and orders extending, amending, or terminating the wiretaps (the wiretap orders). The parties filed a Joint Statement of Undisputed Facts in the Superior Court comprising the following facts.[3]

The first seven wiretap orders, entered between May 18, 2017, and July 12, 2017, were issued by Superior Court Presiding Justice Alice B. Gibney (the Presiding Justice). On July 6, 2017, anticipating that she would be absent for an extended period of time for medical reasons, the Presiding Justice entered an administrative order "[i]n accordance with Section 8-3-4, G.L. 1956 (1997 Reenactment)," which provided that, in her "absence[,] * * * Honorable Robert D. Krause is hereby designated to act and perform all the duties inherent in the Office

---

[3] We commend all counsel and the trial justice for recognizing the significance of the issues presented and reaching a consensus as to undisputed facts, which has facilitated review of the issues.

of the Presiding Justice beginning July 13th, 2017." Justice Krause was the senior associate justice of the Superior Court.

At some point in July 2017, but prior to July 13, 2017, the Presiding Justice orally communicated to Associate Justice Melanie Wilk Thunberg that, during the Presiding Justice's absence, Justice Thunberg was the designated justice to act and perform the duties of the Presiding Justice with respect to the wiretap orders in the present cases. The Presiding Justice delegated this task to Justice Thunberg because, from the Presiding Justice's previous involvement in the investigation, she knew that the cases involved firearms and that Justice Krause was in charge of the Superior Court's Gun Calendar. The Presiding Justice also orally notified the Assistant Attorney General to direct any further applications to Justice Thunberg. No orders, *in camera* or otherwise, entered respecting this assignment.

In October 2017, the Presiding Justice resumed her duties on a part-time basis and entered various administrative orders in her capacity as the Presiding Justice; in January 2018, she returned full-time and resumed all duties as the Presiding Justice. Upon returning full-time, the Presiding Justice informed Justice Krause that she had rescinded his designation as Acting Presiding Justice, but she advised Justice Thunberg to continue to handle the wiretap orders, given that Justice Thunberg had been actively involved in the investigation during the Presiding Justice's absence. Consequently, the Presiding Justice did not issue any

of the wiretap orders after her return in January 2018. From August 2, 2017, through May 2018, Justice Thunberg issued several wiretap orders in connection with the investigation, and Justice Thunberg signed these orders as "Acting Presiding Justice" or "Designated Acting Presiding Justice."[4]

On December 5, 2018, McGuire filed a motion to suppress "any and all wire, electronic, or oral communications seized during the * * * investigation * * * in 2017 and 2018" because, he contended, the wiretap orders issued between August 2017 and May 2018 "were signed by a person not authorized to grant such orders" in accordance with G.L. 1956 § 12-5.1-3. As noted *supra* at footnote 1, twenty-four defendants joined in the motion to suppress.

The trial justice granted the motion to suppress with respect to all orders issued after July 13, 2017, as well as the evidence derived from those wiretaps. The trial justice found that, although the Presiding Justice had no conflict of interest, she nonetheless disqualified herself during her impending absence and also disqualified Justice Krause, the senior associate justice, from entering the wiretap orders; and that, sometime between July 6, 2017, and July 13, 2017, she orally designated Justice Thunberg to handle the wiretap applications and orders in

---

[4] The trial justice found that "Justice Thunberg signed the orders she issued on August 2, 2017; August 23, 2017; October 20, 2017; December 19, 2017; February 13, 2018; March 12, 2018; April 9, 2018; and May 8, 2018, as 'Acting Presiding Justice.' She signed orders she issued on September 22, 2017; January 21, 2018; and February 27, 2018 as 'Designated Acting Presiding Justice.'"

connection with the investigation. Although, in accordance with the administrative order, Justice Krause became the Acting Presiding Justice on July 13, 2017, the trial justice found no evidence that the investigation was referred to Justice Krause or that Justice Krause disqualified himself from receiving applications or issuing the wiretap orders.

Based on a strict construction of chapter 5.1 of title 12, the "Interception of Wire and Oral Communications" act (the wiretap act), the trial justice determined that the wiretap act mandated that the applications be made to Justice Krause, as the senior associate justice and "Acting Presiding Justice" at the time. Specifically, she concluded that, because the Presiding Justice was without statutory authority under § 12-5.1-3 to disqualify the senior associate justice from receiving and acting upon the wiretap applications and orders in her absence, the designation of Justice Thunberg to fulfill this duty violated the wiretap act. In addition, she determined that, because Justice Krause was serving as the "Acting Presiding Justice" until the Presiding Justice resumed her duties in January 2018, Justice Thunberg lacked the statutory authority under the wiretap act to enter the wiretap orders as acting presiding justice or as designated acting presiding justice. Accordingly, the trial justice determined that these violations of the wiretap act rendered the wiretap orders null and void *ab initio* and that, therefore, suppression of the evidence was the appropriate remedy. The state filed timely appeals.

## Standard of Review

"Questions of statutory interpretation are reviewed *de novo* by this Court."[5] *State v. Oster*, 922 A.2d 151, 160 (R.I. 2007). When interpreting a statute, "our ultimate goal is to give effect to the purpose of the act as intended by the Legislature." *Id.* (quoting *Webster v. Perrotta*, 774 A.2d 68, 75 (R.I. 2001)). If "the language of the statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." *Id.* (brackets omitted) (quoting *Accent Store Design, Inc. v. Marathon House, Inc.*, 674 A.2d 1223, 1226 (R.I. 1996)). We previously have held that we "will not construe a statute to reach an absurd result." *Id.* (quoting *Kaya v. Partington*, 681 A.2d 256, 261 (R.I. 1996)).

"[T]his Court will examine statutes in their entirety, and will 'glean the intent and purpose of the Legislature from a consideration of the entire statute, keeping in mind the nature, object, language and arrangement of the provisions to be construed.'" *Oster*, 922 A.2d at 160 (brackets omitted) (quoting *In re Advisory to the Governor (Judicial Nominating Commission)*, 668 A.2d 1246, 1248 (R.I.

---

[5] Although this Court typically reviews a motion to suppress under a "clearly erroneous" standard, the questions before us do not involve factual issues, which have been stipulated to, but rather questions of statutory interpretation. *See State v. Harrison*, 66 A.3d 432, 441 (R.I. 2013); *see also State v. Page*, 709 A.2d 1042, 1044 (R.I. 1998) ("In reviewing a trial justice's denial of a criminal defendant's motion to suppress a confession, we review the justice's factual findings deferentially under a 'clearly erroneous' standard."). Therefore, we proceed with a *de novo* review.

1996)).  "When a specific statute conflicts with a general statute, our law dictates that precedence must be given to the specific statute." *Warwick Housing Authority v. McLeod*, 913 A.2d 1033, 1036-37 (R.I. 2007); *see* G.L. 1956 § 43-3-26 (governing the method of construing general and specific statutory provisions that are in conflict).

## Analysis

On appeal, the state argues that, according to G.L. 1956 § 8-3-4, the Presiding Justice had authority to designate Justice Thunberg to act upon the wiretap applications and issue the orders because that statute allows the Presiding Justice, in her absence, to designate any associate justice to fulfill the duties of her office.  The state also avers that the trial justice erred in finding that the Presiding Justice had disqualified herself from considering the wiretap applications and erroneously concluded that all such applications be submitted to Justice Krause pursuant to § 12-5.1-3.  In the event the wiretap orders violated the wiretap act, however, the state asserts that such violation does not warrant the suppression of evidence.  In the alternative, the state requests that this Court apply the good-faith exception to the exclusionary rule.

In the context of governmental intrusion upon personal communications, this Court has determined that "the citizens of this state have a double [barreled] source of protection which safeguards their privacy from unauthorized and unwarranted

intrusions: the [F]ourth [A]mendment of the Federal Constitution and the Declaration of Rights which is specified in the Rhode Island Constitution." *State v. Luther*, 116 R.I. 28, 29, 351 A.2d 594, 594-95 (1976). The Fourth Amendment to the United States Constitution and article 1, section 6 of the Rhode Island Constitution protect "[t]he right of the people * * * against unreasonable searches and seizures[.]" U.S. Const., Amend. IV; R.I. Const., art. 1, § 6.

Nonetheless, "[t]he [United States] Supreme Court * * * has recognized the right and power of state courts as final interpreters of state law 'to impose higher standards on searches and seizures under state constitutions than required by the Federal Constitution.'" *Pimental v. Department of Transportation*, 561 A.2d 1348, 1350 (R.I. 1989) (brackets omitted) (quoting *Cooper v. California*, 386 U.S. 58, 62 (1967)). Consequently, with regard to the interception of wire and oral communications "under the guarantees of our State Constitution, we [have] establish[ed] a higher standard of protection to our citizens than might otherwise be afforded under the [F]ourth [A]mendment." *Luther*, 116 R.I. at 29, 351 A.2d at 595; *see State v. Maloof*, 114 R.I. 380, 383-84, 333 A.2d 676, 678 (1975) ("Wiretapping or electronic eavesdropping may be a valuable tool in a police officer's arsenal as he wages war with the criminal element in our society[;] [h]owever, the use of such devices poses a threat to a constitutional right[.]") (footnote omitted) (citing R.I. Const., art. 1, § 6). In *Maloof*, we described this

"double-barreled right" as one "that protects conversations as well as property[.]" *Maloof*, 114 R.I. at 389, 333 A.2d at 681.

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (the federal wiretap act) was enacted with the declared purpose of prohibiting, "on the pain of criminal and civil penalties," the interception of *any* wire, electronic, or oral communication unless specifically allowed for under the act. *United States v. Giordano*, 416 U.S. 505, 514 (1974); *see* 18 U.S.C. § 2511 (providing that unless an interception of wire, oral, or electronic communications is specifically allowed and strictly followed under the federal statute, interception is unlawful, the violation of which may subject an offender to fines and imprisonment). The Rhode Island General Assembly adopted the state wiretap act "in response to [the federal wiretap act,] * * * [and it is] in most respects * * * a carbon copy of its federal counterpart[.]"[6] *Maloof*, 114 R.I. at 381, 333 A.2d at 677. In fact, § 12-5.1-15 of the wiretap act states that an application for interception of wire and

---

[6] We note that, historically, Rhode Island has been reluctant to permit the interception of wire and oral communications. For instance, at first pass in 1949, the General Assembly declared wiretapping, absent narrow exceptions, a felony offense and under *no circumstances* allowed the "state's use in the courts of any evidence obtained through such a tap." *State v. Maloof*, 114 R.I. 380, 385, 333 A.2d 676, 679 (1975); *see* P.L. 1949, ch. 2325, § 1 (providing exceptions to electronic interceptions only for "corporation[s] subject to the jurisdiction of the public utility administrator, or to the jurisdiction of the federal communications commission, or to the employees of any such corporation while engaged in the conduct of its business"); *see also* G.L. 1956 §§ 11-35-12, 11-35-13 (repealed by P.L. 1969, ch. 55, § 2).

oral communications shall "conform the proceedings or the issuance of any [such] order * * * to the provisions of the Constitution of the United States or of any law of the United States[,]" which includes the federal wiretap act.

Yet, we steadfastly remain "concerned in these [wiretap] cases with ensuring that statutorily authorized electronic surveillance would take place 'only when the individual, subject to this secretive form of search and seizure, is afforded a full measure of protection.'" *State v. Sitko*, 460 A.2d 1, 3 (R.I. 1983) (quoting *Luther*, 116 R.I. at 29-30, 351 A.2d at 595). Thus, we continue to afford greater protection against intercepted wire, electronic, and oral communications because these seizures are more intrusive on personal privacy than the typical search warrant. *See In re United States*, 10 F.3d 931, 938 (2d Cir. 1993) (distinguishing between a search warrant and a wiretap's level of intrusion on privacy). Indeed, the interception of wire, electronic, or oral communications is available only as the last resort, after a showing that "other investigative procedures have been tried and failed[.]" Section 12-5.1-2(b)(3); *see* § 12-5.1-4(a)(3) (mandating that, for a wiretap order to issue, the presiding justice must determine that "[n]ormal investigative procedures have been tried and have failed").

Because of the intrusion of wiretap investigations on rights that we deem sacrosanct, "we [have] exercised our prerogative to adopt a higher standard of protection[.]" *Luther*, 116 R.I. at 29, 351 A.2d at 595. Thus, we "insist[] that there

be strict compliance with the explicit directives detailed in [the wiretap act]" and have held that "[w]hile 'substantial compliance' [with the wiretap act] may be rhetorically admirable, it is constitutionally insufficient." *Id.* at 29, 30, 351 A.2d at 595.

## A

### Statutory Authority to Issue the Wiretap Orders

The trial justice found that Justice Thunberg was not authorized to receive applications or issue the wiretap orders under the wiretap act. On appeal from this decision, the state urges us to look to § 8-3-4, and not the wiretap act itself. According to the state, § 8-3-4 grants a presiding justice the authority to designate any associate justice to perform his or her duties during his or her absence; thus, the state contends, the Presiding Justice had the authority to designate Justice Thunberg to administer the wiretap orders.[7] We recognize that we have never had

---

[7] General Laws 1956 § 8-3-4, titled "Vacancy in office, inability, or absence of presiding justice of superior court[,]" states, in pertinent part, that:

> "Whenever * * * the presiding justice shall be unable by reason of illness to perform the duties of his office, the associate justice of the superior court having precedence who is present and qualified to act shall perform the duties of the office until * * * the inability [is] removed. In the event that the presiding justice determines that his or her absence will prevent him or her from performing the duties of his or her office, he or she shall designate an associate justice to perform the duties during the period of his or her absence."

- 12 -

the occasion to address the dichotomy of these two statutes. Today we resolve this disparity and conclude that § 8-3-4 is inapplicable to cases involving the interception of wire, electronic, or oral communications, which are governed by the wiretap act.

The General Assembly has determined that two of the solemn duties and functions of the Superior Court's presiding justice include granting immunity from prosecution and the administration of the interception of wire, electronic, or oral communications. *See* G.L. 1956 § 12-17-15 ("[T]he attorney general may, in writing, request the presiding justice of the superior court * * * to order the witness to answer the question or produce the evidence."); *see also* §§ 12-5.1-3, 12-5.1-4. Although § 8-3-4 generally provides for the vacancy, inability, or absence of the presiding justice, §§ 12-5.1-3 and 12-5.1-4 specifically delineate who may receive wiretap applications and issue wiretap orders. *See McLeod*, 913 A.2d at 1036-37.

With respect to wiretap orders, the application and issuance process must adhere to the provisions of the wiretap act, rather than other general statutory provisions. For example, in *Giordano*, cited *supra*, an application for an order approving the interception of communications was authorized by the United States Attorney General's Executive Assistant. *Giordano*, 416 U.S. at 508, 512. The Supreme Court held that 18 U.S.C. § 2516(1), which then provided that "the Attorney General, or any Assistant Attorney General specially designated by the

Attorney General, may authorize" an application for a wiretap order, *id.* at 512-13 (brackets omitted) (quoting § 2516(1)), did not allow the Attorney General to delegate the power to authorize applications to the Attorney General's Executive Assistant, even though 28 U.S.C. § 510 authorized the Attorney General to delegate any of his functions to "any other officer, employee, or agency of the Department of Justice[.]" *Id.* at 513, 514 (quoting § 510).

Furthermore, in *In re United States*, cited *supra*, the United States Court of Appeals for the Second Circuit considered the government's petition for a writ of mandamus to a district court judge that challenged his authority to delegate to a magistrate judge the responsibility to review wiretap applications in accordance with the federal wiretap act. *In re United States*, 10 F.3d at 932, 933. The Second Circuit noted that the federal wiretap act "contains a number of provisions designed to tightly control the use of this prosecutorial tool and to safeguard the privacy interests of those subjected to a wiretap." *Id.* at 934.

The circuit court in *In re United States* observed that 18 U.S.C. § 2518(1) of the federal wiretap act requires that wiretap applications be made to a "judge of competent jurisdiction[,]" which was defined by 18 U.S.C. § 2510(9) to include only "a judge of a United States district court or a United States court of appeals" and a state court judge of a court of general jurisdiction "who is authorized by state law to enter wiretapping orders." *In re United States*, 10 F.3d at 934 (quoting

§ 2510(9), § 2518(1)).  The court also looked to and rejected two other competing statutory provisions. *See id.* at 934-35.  First, the circuit court looked to 28 U.S.C. § 636(b)(1)(A) of the federal magistrates act, which allows a district court judge, "[n]otwithstanding any provision of law to the contrary[,] * * * [to] designate a magistrate [judge] to hear and determine any pretrial matter[,]" except those expressly excluded in that subsection—which does not include the interception of wire, electronic, or oral communications as one of the exclusions. *Id.* at 934 (emphasis omitted) (quoting § 636(b)(1)).  Additionally, the circuit court considered § 636(b)(3), which authorizes a district court to assign to magistrates "such additional duties as are not inconsistent with the Constitution and laws of the United States." *Id.* at 935 (emphasis omitted) (quoting § 636(b)(3)).

Nonetheless, the circuit court in *In re United States* observed that, "[t]he *Giordano* Court based its holding on the purpose and the legislative history of [the federal wiretap act], fairly read." *In re United States*, 10 F.3d at 937.  The court reasoned that "[t]he same approach also support[ed] the view that Congress wanted to limit the power to review applications to specified judicial officers." *Id.* Therefore, the circuit court declined, "in the absence of explicit statutory direction, to expansively interpret [the federal wiretap act's] definition of a 'judge of competent jurisdiction,' 18 U.S.C. § 2510(9), to include magistrate judges." *Id.* at 938.

Similar to *Giordano* and *In re United States*, §§ 12-5.1-3 and 12-5.1-4 of our state's wiretap act specifically set forth who is vested with the authority to receive wiretap applications and issue wiretap orders. *See* §§ 12-5.1-3, 12-5.1-4; *see also Giordano*, 416 U.S. at 512-13; *In re United States*, 10 F.3d at 937-38. Accordingly, the issues before us are strictly governed by our state wiretap act. In pertinent part, these sections provide that:

> "Application for an order to intercept wire, electronic, or oral communication may be made to the presiding justice of the superior court or the senior associate justice of the superior court whenever the presiding justice shall deem it necessary to disqualify himself or herself from entering the order." Section 12-5.1-3.

> "Upon the application * * * the presiding justice of the superior court, or the senior associate justice of the superior court when the presiding justice shall disqualify himself or herself from entering the order, may enter an ex parte order, as required or as modified, authorizing the interception of wire, electronic, or oral communications if the [application meets certain criteria.]" Section 12-5.1-4(a).

According to these sections, *only* the presiding justice, or the senior associate justice of the Superior Court when the presiding justice deems it necessary to disqualify himself or herself from entering the wiretap orders, may receive applications or issue the wiretap orders. *See* §§ 12-5.1-3, 12-5.1-4(a).

The state argues that the trial justice erred in finding that the Presiding Justice disqualified herself from considering the wiretap applications and,

- 16 -

consequently, in concluding that § 12-5.1-3 mandated that the applications be submitted to Justice Krause. The state proffers a narrow definition of the term "disqualify," as only a "conflict of interest, bias, or knowledge about the investigation that would prevent the presiding justice from impartially reviewing the wiretap application." (Citing Black's Law Dictionary (10th ed. 2014); Art. VI, Rule 2.11(A) of the Supreme Court Code of Judicial Conduct.) Although we view the state's definition to be overly narrow in the context of judicial decision-making, we conclude that the definition of the word "disqualification" is of no moment under the facts presented herein and, thus, decline to engage in such an analysis.

We reiterate that the wiretap act authorizes *only* the presiding justice or the senior associate justice whenever the presiding justice "shall deem it necessary to disqualify himself or herself[,]" and no one else. Section 12-5.1-3; *see* § 12-5.1-4. Therefore, only those two individuals are vested with the statutory authority to issue wiretap orders.

This stringent limitation on the authority to issue wiretap orders is made apparent by the legislative history and context of the wiretap act. The first version of the wiretap act authorized only the presiding justice to receive wiretap applications and issue such orders, until the act was amended in 1980 to add only the senior associate justice, in the event the presiding justice deemed it necessary

- 17 -

to disqualify himself or herself. *See* §§ 12-5.1-3 and 12-5.1-4, as amended by P.L. 1980, ch. 100, § 1. Simultaneously, in the same public law, § 12-5.1-12(c) was also amended to authorize the presiding justice to designate any associate justice to hear and decide a motion to suppress evidence derived from a wiretap investigation. *See* § 12-5.1-12(c), as amended by P.L. 1980, ch. 100, § 1. Also, during the same legislative session, § 8-3-4 was amended to distinguish between (1) the associate justice having precedence whenever there is a vacancy in the office of the presiding justice or the presiding justice is unable to serve due to illness; and (2) the designation of any associate justice due to the presiding justice's absence. *See* § 8-3-4, as amended by P.L. 1980, ch. 132, § 1. These simultaneous amendments demonstrate the General Assembly's awareness of § 8-3-4, the various sections of the wiretap act, and the difference between the authority assigned by these provisions. *See Pellegrino v. Rhode Island Ethics Commission*, 788 A.2d 1119, 1124 (R.I. 2002) ("The Legislature is presumed to know the state of existing relevant law when it enacts a statute[.]") (alterations omitted) (quoting *State v. Reis*, 430 A.2d 749, 752 (R.I. 1981)). Had the General Assembly intended for another associate justice of the Superior Court, other than the senior associate justice, to administer wiretap orders when the presiding justice deemed it necessary to disqualify himself or herself, it would have done so.

Lastly, we note that the interception of wire, electronic, or oral communications is distinguishable from less intrusive searches. For instance, a search warrant can be issued by *any* district, family, superior, or supreme court judge or justice. *See* G.L. 1956 § 12-5-1. The distinction between search warrants and wiretaps was markedly drawn in *In re United States*, cited *supra*, as follows:

> "A wiretap may capture the intimate details of a person's life over an extended period of time without that person's knowledge. In contrast, a search pursuant to a warrant, which has long been a recognized tool of the prosecutor, occurs just once and, by its nature, puts the person searched on notice of the violation of privacy. A wiretap is like a continuous film of events in your home, secretly recorded over a period of weeks or months. A search is like a surprise snapshot of your home taken in your presence. The former is obviously a far greater invasion of privacy than the latter." *In re United States*, 10 F.3d at 938.

On July 6, 2017, per administrative order of the Presiding Justice, Justice Krause was designated as the Acting Presiding Justice, beginning on July 13, 2017. Assuming that the Presiding Justice deemed it "necessary to disqualify * * * herself" due to her impending medical leave of absence, Justice Krause, the senior associate justice, was the only person statutorily vested with the authority to receive wiretap applications and issue orders in accordance with §§ 12-5.1-3 and 12-5.1-4. Upon the Presiding Justice's return, she did not disqualify herself and therefore was the only person authorized to receive applications and issue orders pursuant to the wiretap act. *See* §§ 12-5.1-3, 12-5.1-4. Although the parties

stipulated that the Presiding Justice did not disqualify herself, the trial justice drew an inference that she did so.[8]  Even if we were to assume that the Presiding Justice disqualified herself, however, this does not change the outcome here.  Ultimately, under any reading of the term "disqualification," Justice Thunberg would not have had the authority to issue the wiretap orders because the only persons authorized by §§ 12-5.1-3 and 12-5.1-4 were the Presiding Justice or, if she disqualified herself, Justice Krause.[9] *See* §§ 12-5.1-3, 12-5.1-4.

"Procedural safeguards," such as the requirement that the presiding justice or senior associate justice enter the wiretap orders, "have been developed in order to guarantee 'the right of the people to be secure in their persons, houses, papers, and effects.' * * * Such safeguards provide restraints against unreasonable searches and seizures." *State v. Nunez*, 634 A.2d 1167, 1171 (R.I. 1993) (brackets omitted)

---

[8] We respectfully suggest that, in the event the Presiding Justice did not "deem it necessary to disqualify * * * herself[,]" G.L. 1956 § 12-5.1-3, she was required to administer the wiretap investigation herself or to conclude or pause the investigation.

[9] Even if we were to apply § 8-3-4, however, our conclusion would be the same because the Presiding Justice designated Justice Krause, rather than Justice Thunberg, as "Acting Presiding Justice" by administrative order; and then, upon the Presiding Justice's return to her duties, the need for an acting or designated presiding justice no longer existed. *See* § 8-3-4.  The Superior Court can have only one presiding justice. *See* G.L. 1956 § 8-2-1 ("There shall be a superior court which *shall* consist of *a* presiding justice and twenty-one (21) associate justices.") (emphasis added); *see also* § 8-3-4 ("[T]he presiding justice * * * shall designate *an* associate justice * * *.") (emphasis added).

- 20 -

(quoting U.S. Const., Amend. IV). When one of the statutorily proscribed safeguards has been violated, "we are bound to find the warrant invalid." *Id.*

Although we have no doubt that the justices of the Superior Court and the Office of the Attorney General acted in good faith and that Justice Thunberg was well qualified to issue the wiretap orders and did so with the utmost due diligence prescribed under her oath of office, there simply was no statutory authority to designate an associate justice, other than the senior associate justice, to administer the orders arising from the wiretap investigation. Consequently, we are constrained to conclude that, because Justice Thunberg was not vested with the statutory authority to administer and sign the wiretap orders issued on August 2, 2017, and thereafter, the trial justice correctly concluded that these orders were in violation of the wiretap act. *See* §§ 12-5.1-3, 12-5.1-4.

**B**

**Suppression of the Evidence**

The state argues that Justice Thunberg's authorization of the wiretap orders, even if in violation of the wiretap act, does not warrant suppression of the evidence because the purpose of the wiretap act was "nevertheless satisfied"—that is, the wiretap orders did not breach the defendants' privacy interests. In support, the state distinguishes the instant wiretap orders from cases in which the wiretap orders were held to be facially invalid as lacking in statutorily mandated language,

thus violating the defendant's expectation of privacy and warranting suppression. (Citing *Sitko*, 460 A.2d at 3-4; *Luther*, 116 R.I. at 29, 351 A.2d at 595; *Maloof*, 114 R.I. at 387-90, 333 A.2d at 680-82.) As the state recognizes, this Court has not yet had the occasion to consider whether suppression of evidence is warranted where the authority to issue a wiretap order is lacking.

Section 12-5.1-12 provides, in pertinent part, that, "[a]ny aggrieved person may move to suppress the contents of any intercepted wire, electronic, or oral communication or evidence derived from them on the grounds that * * * (1) [t]he communication was unlawfully intercepted; [or] (2) [t]he order under which it was intercepted is insufficient on its face[.]" Section 12-5.1-12(a)(1), (2). Accordingly, "[b]oth Congress and the General Assembly require the suppression of evidence that has been 'unlawfully intercepted' or is the result of an authorization order that is 'insufficient on its face[.]'" *Maloof*, 114 R.I. at 386-87, 333 A.2d at 679.

We have recognized that the United States Supreme Court has "held that the phrase 'unlawfully intercepted' * * * included within its ambit any failure '* * * to satisfy * * * those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device.'" *Maloof*, 114 R.I. at 387, 333 A.2d at 680 (quoting *Giordano*, 416 U.S. at 527). Communications are unlawfully intercepted when, for instance, an

application is authorized by an officer other than one specifically called for under the statute, because "Congress never intended that the power to authorize wiretap applications" rest with anyone other than those officials specified in the statute. *Id.* at 387, 333 A.2d at 680.

For instance, in *Giordano*, because the power to authorize wiretap applications was statutorily vested in only two individuals—the Attorney General and his or her specially designated assistant—the approval of the wiretap application by an individual without statutory authority violated the federal wiretap act, and the communications were thus "unlawfully intercepted[,]" requiring suppression of the evidence. *See Giordano*, 416 U.S. at 514, 524, 527, 528. Specifically, the Court in *Giordano* held that the statutory requirement, providing that only a senior official in the Department of Justice approve a wiretap application, "was intended to play a central role in the statutory scheme" by limiting the use of wiretap interception, which has been deemed to be an "extraordinary investigative device." *Id.* at 527, 528. As such, failure to satisfy the requirement that only an authorized individual exercises the solemn authority granted under the statute results in an unlawful interception, and "suppression must follow[.]" *Id.* at 528.

In 1975 this Court first determined that when an intercept order fails to comply in form and content with the requirements specified in § 12-5.1-5—such as

stating, in complete contravention to the statute, that the order "need not terminate upon the accomplishment of the order's purpose"—the order is "insufficient on its face"; as a result of the "unwarranted and *unauthorized intrusion*[,]" the evidence must be suppressed. *Maloof*, 114 R.I. at 388, 389, 333 A.2d at 680, 681 (emphasis added). Months later, this Court held that wiretap orders lacking three provisions mandated by § 12-5.1-5 were "a nullity" requiring suppression of the evidence. *Luther*, 116 R.I. at 30, 351 A.2d at 595. Similarly, in 1983, we held that a wiretap order's failure to fully comply with § 12-5.1-5, by lacking a description of the type of communications sought to be intercepted, deemed the order facially insufficient, warranting suppression. *See Sitko*, 460 A.2d at 3, 4, 6.

Although we have not had the opportunity to consider a judicial officer's authority to issue an order in accordance with the wiretap act, we have considered this issue in the context of a search warrant, which "may be issued by any judge of the district court[,]" pursuant to chapter 5 of title 12 of the general laws. *See Nunez*, 634 A.2d at 1168, 1169 (quoting § 12-5-1). In *Nunez*, this Court considered the validity of a warrant issued by a retired judge of the District Court—rather than an active judge of the District Court or an active justice of the Superior or Supreme Court, in accordance with § 12-5-1. *See id.* at 1168. Because the retired judge was without authority, statutory or otherwise, to issue the warrant—in violation of one of the "[p]rocedural safeguards * * * [that] have been

- 24 -

developed in order to guarantee 'the right of the people to be secure in their persons, houses, papers, and effects'"—this Court determined that the warrant was invalid and void *ab initio*, and the judgment of conviction was quashed. *Id.* at 1170, 1171 (quoting U.S. Const., Amend. IV).

Turning to the cases at bar, we begin by reiterating that it is manifest on the record before us that all executive and judicial officers involved in this series of events acted in the best interest of the State of Rhode Island, and that Justice Thunberg was a neutral and detached judicial officer who is highly competent to perform such an endeavor. However, she simply lacked the statutory authority to receive the applications and issue the wiretap orders. Thus, we conclude that the wiretap orders were invalid, and, consequently, the interception of communications pursuant to those orders amounted to "*unauthorized intrusions*" into these defendants' private communications. *Maloof*, 114 R.I. at 389, 333 A.2d at 681 (emphasis added).

Nonetheless, the state insists that defendants did not meet *their* burden of demonstrating that the orders, if invalid, deprived them of the full measure of protection of their privacy interests. However, it is the *government's* burden to "demonstrate[] to the [C]ourt's satisfaction that the statutory purpose has been achieved despite the violation [of the wiretap act]." *United States v. López*, 300

F.3d 46, 56 (1st Cir. 2002) (quoting *United States v. Cunningham*, 113 F.3d 289, 293-94 (1st Cir. 1997)).

In light of this Court's conclusion in *Nunez* that the issuance of a search warrant by a judicial officer without statutory authority violated the "[p]rocedural safeguards * * * guarantee[ing] 'the right of the people to be secure in their persons, houses, papers, and effects[,]'" *Nunez*, 634 A.2d at 1171 (quoting U.S. Const., Amend. IV), here, the state has not met its burden to show that suppression is not required—particularly where this Court has declared that wiretap orders must be held to a higher standard of protection.[10] *See Luther*, 116 R.I. at 29, 351 A.2d at 595. Therefore, the wiretap orders at issue here were constitutionally insufficient, and the evidence was unlawfully intercepted.

We have held that the wiretap act "*require*[*s*] the suppression of evidence that has been 'unlawfully intercepted[.]'" *Maloof*, 114 R.I. at 386, 333 A.2d at 679 (emphasis added). We now hold that a wiretap order that is issued by a judicial officer without statutory authority results in an invalid order that is void *ab initio*, *see Nunez*, 634 A.2d at 1170, 1171, and its use to garner wire, electronic, or oral communications results in unlawfully intercepted evidence that must be

---

[10] Further, "it is the responsibility of those who must prepare the authorization orders for which they seek court approval to 'approach their task with both the pertinent statute book before them and the desire for an exacting standard of precision.'" *State v. Sitko*, 460 A.2d 1, 6 (R.I. 1983) (quoting *State v. Luther*, 116 R.I. 28, 30, 351 A.2d 594, 595 (1976)).

suppressed. *See Giordano*, 416 U.S. at 528; *see also Maloof*, 114 R.I. at 386-87, 333 A.2d at 679. Thus, we conclude that the evidence in the cases at bar requires suppression.

Although the state asserts that Justice Thunberg had *de facto*, if not *de jure*, authority to issue the wiretap orders, we decline to apply these doctrines to a judicial officer acting without authority, particularly under the facts of these appeals. First, having determined that, under the wiretap act, only the presiding justice and senior associate justice have been vested with the authority to receive applications and issue wiretap orders, there was no *de jure* authority for Justice Thunberg, or any other associate justice, to perform these duties. *See Nunez*, 634 A.2d at 1169, 1170 (determining that the retired judge was not acting in a capacity allowed under statute and, thus, lacked *de jure* authority). Second, the *de facto* authority theory is wholly inapplicable here. There can be no color of authority, either "of title or on possession of any office as acquiesced in by the public[,]" *id.* at 1170 (quoting *Apice v. American Woolen Co., Inc.*, 74 R.I. 425, 435, 60 A.2d 865, 870 (1948)), when the Presiding Justice actively held the official office and Justice Krause was designated, per administrative order, as the acting presiding justice for all duties prescribed to that office. *See Nguyen v. United States*, 539 U.S. 69, 77, 78, 79 (2003) (considering the distinction between a valid act of a judge with *de facto* authority where there was a "'merely technical' defect of

- 27 -

statutory authority[,]" and an invalid act which could not have been taken).  We decline to venture any further into this theory.

Accordingly, in the face of invalid wiretap orders, suppression of the evidence is the appropriate remedy.  Consequently, there was no error in the trial justice's finding that the evidence derived from the invalid wiretap orders must be suppressed.

## C

### The Good-Faith Exception

Alternatively, the state asks this Court to adopt the good-faith exception to the exclusionary rule as provided for in *United States v. Leon*, 468 U.S. 897 (1984).

In *Leon*, the United States Supreme Court created an exception to the exclusionary rule "when *an officer* acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." *Leon*, 468 U.S. at 920 (emphasis added).  The Supreme Court, however, recognized that "[t]he Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands," and the exclusionary rule "thus operates as 'a judicially created remedy[.]'" *Id.* at 906 (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)).

We are hard-pressed to conceive that a judicially-created exception to a judicially-created exclusionary rule, such as the *Leon* good-faith rule, is applicable to the strict statutory mandates under review in these cases. First, it is unlawful to intercept wire, oral, or electronic communications unless specifically allowed in the statute, and, second, the use of evidence obtained in violation of its commands is expressly prohibited. *See* 18 U.S.C. § 2511 (declaring the interception of wire, oral, or electronic communication unlawful "[e]xcept as otherwise specifically provided" under the federal wiretap act); *see also* 18 U.S.C. § 2515 (prohibiting use of evidence that violates the federal wiretap act); *Luther*, 116 R.I. at 29, 351 A.2d at 595 (establishing that the state wiretap act is intended to provide "a higher standard of protection to our citizens than might otherwise be afforded under the [F]ourth [A]mendment"). Thus, we find no reason to deviate from our jurisprudence, and we "decline to consider whether we shall adopt the 'good faith exception' rule propounded in [*Leon*]." *Nunez*, 634 A.2d at 1171.

## Conclusion

For the foregoing reasons, we affirm the order of the Superior Court granting the defendants' motion to suppress. The papers in these consolidated cases shall be returned to the Superior Court for further proceedings.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI 02903

### OPINION COVER SHEET

| | | |
|---|---|---|
| **Title of Case** | State v. Deric S. McGuire et al. | |
| **Case Number** | No. 2019-324-C.A. (P1/18-3099AG)<br>No. 2019-326-C.A. (P1/18-3099AAG)<br>No. 2019-328-C.A. (P1/18-3099BBG)<br>No. 2019-329-C.A. (P1/18-3099BG)<br>No. 2019-330-C.A. (P1/18-3099CG)<br>No. 2019-333-C.A. (P1/18-3099DDG)<br>No. 2019-334-C.A. (P1/18-3099EEG)<br>No. 2019-335-C.A. (P1/18-3099EG)<br>No. 2019-336-C.A. (P1/18-3099FG)<br>No. 2019-344-C.A. (P1/18-3099GG)<br>No. 2019-345-C.A. (P1/18-3099HG)<br>No. 2019-346-C.A. (P1/18-3099JG)<br>No. 2019-349-C.A. (P1/18-3099PG)<br>No. 2019-352-C.A. (P1/18-3099QG)<br>No. 2019-354-C.A. (P1/18-3099SG)<br>No. 2019-355-C.A. (P1/18-3099VG)<br>No. 2019-358-C.A. (P1/18-3099WG)<br>No. 2019-361-C.A. (P1/18-3099YG)<br>No. 2019-363-C.A. (P1/18-3099OOG) | |
| **Date Opinion Filed** | May 5, 2022 | |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. | |
| **Written By** | Associate Justice Maureen McKenna Goldberg | |
| **Source of Appeal** | Providence County Superior Court | |
| **Judicial Officer from Lower Court** | Associate Justice Netti C. Vogel | |

| | | |
|---|---|---|
| **Attorney(s) on Appeal** | For State:<br><br>Christopher R. Bush<br>Department of Attorney General | |
| | For Defendants:<br><br>John F. Cicilline, Esq.<br><br>Megan F. Jackson<br>Office of the Public Defender | |